No. 96,189

STATE OF KANSAS, *Appellant*, v. LACEY RANA SMITH, *Appellee*.

(184 P.3d 890)

Opinion filed May 30, 2008.

*Larry R. Schwartz*, of Arkansas City, was on the brief for appellee.

*James R. Spring*, deputy county attorney, *Christopher Smith*, county attorney, and *Phill Kline*, attorney general, were with him on the brief for appellant.

The opinion of the court was delivered by

LUCKERT, J.: In *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), the United States Supreme Court held that law enforcement officers could ask questions unrelated to the

purpose of a search when executing a warrant authorizing the
search of a residence. This case raises the question of whether that
decision alters our longstanding rule that a law enforcement officer
violates the Fourth Amendment to the United States Constitution
and § 15 of the Kansas Constitution Bill of Rights by asking a
passenger in a vehicle stopped for a traffic violation to consent to
a search that is unrelated to the purpose of the stop.

We conclude it does not. *Mena* does not overrule longstanding
precedent limiting the scope of an investigatory detention, does
not address the question of the scope of an investigatory detention,
and is factually and legally distinguishable from this case.

*Facts*

In the early morning hours of September 22, 2005, Officer Nick
Carter saw a vehicle with a broken taillight driving down a road in
Winfield, Kansas. Carter followed the vehicle. Before he could sig-
nal the driver to pull over, the driver parked the vehicle in an
angled parking space on the side of the street. Carter stopped his
patrol car behind it and activated the emergency lights. While
checking the license plate number with the dispatcher, Officer Car-
ter noticed the vehicle had expired tags. The driver got out and
approached the patrol car. Carter spoke to the driver about the
reason for the stop (the broken taillight) and also asked him about
the expired tag. When Officer Carter checked the vehicle's tag
information and VIN number with police dispatch, he discovered
that the tag was illegal. The driver told Carter that the car belonged
to his girlfriend and he did not know anything about the tag. Ac-
cording to Carter's testimony, "the vehicle was going to be towed;
[and] the driver was going to get a citation."

Lacey Smith, who was a passenger in the stopped vehicle, got
out of the car and sat down on some nearby steps while Officer
Carter spoke to the driver. Carter recognized Smith and knew her
by name. He testified that Smith was not the registered owner of
the car or the license tag, and he did not believe Smith was the
driver's girlfriend. Aside from briefly greeting Smith, Officer Car-
ter interacted solely with the driver of the vehicle.

Meanwhile, Officer Cory Gale heard over the police radio that Carter had made the stop. Gale drove to the scene to provide backup assistance, a practice he indicated was common during nighttime stops. After seeing Smith sitting near the vehicle, Officer Gale also recognized her and determined she was a passenger. Based on information received sometime before this traffic stop, Gale suspected Smith possessed drugs and intended to ask her permission to search her purse. Gale approached Smith and asked how she was doing and if he could look inside her purse. Smith consented, and inside her purse, Gale discovered a bag containing methamphetamine. Officer Gale arrested Smith and took her to the police station.

Officer Carter was still in the process of issuing a citation to the driver when Officer Gale and Smith left the scene. At the police station, Gale discovered further incriminating evidence in Smith's possession, including drug paraphernalia. Smith also made some incriminating statements.

## Procedural Background

The State charged Smith with felony possession of methamphetamine and misdemeanor possession of drug paraphernalia. Smith filed a motion to suppress the evidence seized during the search of her purse and person and to suppress her subsequent incriminating statements. At the hearing on the motion, the State conceded that Officer Gale did not have reasonable suspicion to search Smith's purse. It argued instead that Smith consented to the search.

The district court found that Smith had been lawfully seized but the questions Officer Gale asked her at the beginning of the encounter exceeded the scope of the stop and were improper. The court also found that Smith's consent was given during the seizure and there was not a "sufficient attenuation of a seizure to justify the search." Therefore, Smith's motion to suppress was granted.

The district court subsequently granted the State's request for permission to file an interlocutory appeal. The State perfected its appeal to the Court of Appeals, where the district court's decision was reversed. In so ruling, the Court of Appeals rejected the State's

contention that Smith was never "seized" by authorities. Rather, the panel concluded the broken taillight provided a basis for a legal seizure and Smith was subject to a *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), investigatory detention.

The panel pointed out that when Officer Gale arrived on the scene he immediately contacted Smith and questioned her about matters unrelated to the taillight. The Court of Appeals stated: "Prior to the case of *Muehler v. Mena*, 544 U.S. 93, 161 L. Ed. 2d 299, 125 S. Ct. 1465 (2005), this would have rendered the seizure illegal because such questioning was unrelated to the purpose of the traffic stop and fell outside of the permissible scope of a *Terry*-based detention." Slip op. at 6. The panel concluded *Mena* permits officers to question a person during a lawful detention about matters unrelated to the reason for the detention. Therefore, the panel found Gale could question Smith about matters unrelated to the purpose of the stop, *i.e.*, the broken taillight, so long as the questions did not increase the duration of the stop.

The Court of Appeals observed that Officer Gale asked Smith two questions in quick succession: how she was doing and whether he could search her purse. Neither of these questions, according to the panel, extended the length of the traffic stop. The panel highlighted the fact that Officer Carter was still in the process of issuing the citation to the driver when Officer Gale arrested Smith.

With regard to the question of Smith's consent, the panel stated it was not faced with the issue of whether her consent removed the taint of a prior violation of Smith's Fourth Amendment rights. This conclusion was explained by the panel's determination that Smith was "lawfully seized and had suffered no violation of her rights." Slip op. at 7-8. Thus, in the panel's view, it was left only with the issue of whether Smith's consent was voluntary.

Finding that Smith, under a legal detention, offered nothing to indicate she was forced or coerced in any manner to permit Officer Gale to search her purse, the Court of Appeals held that Smith's consent provided the legal basis for the search. Because the panel determined that the search of Smith's purse was legal, it also found that the evidence discovered in her possession at the police station and any incriminating statements made later by Smith did not con-

stitute fruit of the poisonous tree. The district court, therefore, was reversed.

We now consider Smith's petition for review.

*Standard of Review*

Our standard of review is well known. An appellate court reviews the factual underpinnings of the decision on a suppression motion by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). Appellate courts do not reweigh evidence, assess the credibility of witnesses, or resolve conflicts in the evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006); *State v. Jones*, 279 Kan. 71, 73, 106 P.3d 1 (2005). The State has the burden of proving that a search and seizure was lawful. *Thompson*, 284 Kan. at 772; *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006).

The issue in this case arises under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, which assure each person's right to be secure in his or her person and property against unreasonable searches and seizures. An analysis of the motion to suppress requires a determination of whether there was a seizure and whether the subsequent search was valid. *Thompson*, 284 Kan. at 772.

*Was Smith Seized?*

A seizure occurs when there is a "show of authority which, in view of all the circumstances surrounding the incident, would communicate to a reasonable person that he or she is not free to leave and the person submits to the show of authority." *State v. Morris*, 276 Kan. 11, 18-19, 72 P.3d 570 (2003). The law recognizes that a traffic stop is a seizure under the Fourth Amendment. *Thompson*, 284 Kan. at 773.

The seizure resulting from a traffic stop is analyzed as being more akin to an investigatory detention than an arrest. As a result, courts examine the reasonableness of a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1, and codified by the Kansas Legislature in K.S.A. 22-2402(1). *Delaware v. Prouse*, 440

U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979); *Thompson,* 284 Kan. at 773.

*Terry* is premised upon the basic Fourth Amendment right of each person to be secure in his or her person and property against unreasonable searches and seizures. 392 U.S. at 8; see *Ybarra v. Illinois,* 444 U.S. 85, 91-92, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979). This principle incorporates two precepts. First, " 'the Fourth Amendment protects people, not places.' [Citation omitted.]" *Terry,* 392 U.S. at 9. Second, " 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' [Citation omitted.]" *Terry,* 392 U.S. at 9. Indeed, "[t]he 'touchstone of the Fourth Amendment is reasonableness.' Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 39, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996) (quoting *Florida v. Jimeno,* 500 U.S. 248, 250, 114 L. Ed. 2d 297, 111 S. Ct. 1801 [1991]); see *Thompson,* 284 Kan. at 792.

*Terry* breaks the analysis of the legality of traffic stops into two parts: (1) "whether the officer's action was justified at its inception" and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20.

Under the first prong of the test, in order to stop and detain a person, a law enforcement officer must have a reasonable suspicion that criminal activity is taking place, has taken place, or is about to take place. *State v. DeMarco,* 263 Kan. 727, 734, 952 P.2d 1276 (1998). Such activity includes traffic violations. See *Thompson,* 284 Kan. at 773.

Here, Officer Carter observed a taillight infraction and then discovered an illegal tag. These violations justified the stop, and Smith does not dispute the reasonableness of the driver's detention. Nor do the parties dispute that this case should be analyzed as a traffic stop even though the driver had parked the car before Officer Carter activated his lights.

Nevertheless, the State asserts that the valid investigatory stop of the vehicle triggered only a seizure of the driver, and the district court and Court of Appeals panel erred in ruling otherwise. With

regard to Smith, the State contends the encounter was consensual. Pointing out that Smith was neither ordered to remain in the vehicle nor prevented from exiting the car, the State asserts: "That Smith chose to remain in the area does not mean she was not free to leave—she simply chose not to."

After the filing of the Court of Appeals' decision and the parties' briefs before this court, the United States Supreme Court decided *Brendlin v. California*, 551 U.S. 249, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007), and held that a passenger in a vehicle is seized for Fourth Amendment purposes when a law enforcement officer stops the vehicle through a show of authority and the passenger does not flee.

In *Brendlin*, the Court rejected the same argument as asserted by the State in this case, *i.e.,* that the show of authority in a traffic stop was directed toward the driver and not toward passengers. The Court ruled that in pulling over a particular car, the law enforcement officer "acts with an implicit claim of right based on fault of some sort," and, understanding that, a reasonable passenger would "expect to be subject to some scrutiny" even though it is the driver who has committed a wrong. 551 U.S. at 257. The Court noted that a passenger is present at the "physical focal point of an investigation," and at that point a reasonable person would not expect an officer to "let people move around in ways that could jeopardize his safety." 551 U.S. at 257-58. Consequently, there exists a societal expectation of " ' "unquestioned [police] command" ' at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission. [Citation omitted.]" 557 U.S. at 258.

A seizure does not occur simply because there has been a show of authority, however. There must be a submission to that authority. In *Brendlin*, the Court considered whether a passenger, who has no control over the vehicle, submits to the law enforcement officer's authority. Noting that submission can be passive, the Court indicated "one sitting in a chair may submit to authority by not getting up to run away." 551 U.S. at 262. Consequently, even though a passenger had "no effective way to signal submission

while the car was still moving on the roadway, . . . once it came to a stop he could, and apparently did, submit by staying inside." 551 U.S. at 262.

This approach is consistent with the test utilized in Kansas for determining if a seizure has occurred. See *State v. Morris,* 276 Kan. 11, 19, 72 P.3d 570 (2003).

In this case, it is not clear that the driver parked in response to the presence of the law enforcement officer and, apparently, there had been no show of authority by the officer at that point. That situation changed when Officer Carter pulled behind the car, blocked it, and activated emergency lights. A reasonable occupant in the car, whether a driver or a passenger, would understand the officer's actions to be a display of authority directed to everyone in the vehicle. In other words, "all the occupants were subject to like control by the successful display of authority." 551 U.S. at 260.

Smith's submission to this authority is not as clear as was Brendlin's. Smith moved from the vehicle to sit on nearby steps rather than remaining in the car. Yet she did not walk away; she remained at or near the physical focal point of the investigation in a passive submission to the show of authority. Under the totality of the circumstances, we affirm the district court's and Court of Appeals' determinations that Smith was seized for purposes of application of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights.

## *Scope of Detention*

Smith, while conceding the seizure was initially valid, contends her seizure became unlawful when Officer Gale exceeded the permissible scope of the stop. Before the district court and Court of Appeals she argued that the question asked by Officer Gale—something like, "Can I look in your purse?"—was unrelated to the purpose of the traffic stop. Now that the Court of Appeals panel held that this scope argument is no longer valid in light of *Mena,* 544 U.S. 93, Smith argues the panel's broad interpretation and subsequent application of *Mena* erroneously changes established search and seizure law in Kansas.

Smith's argument rests on the second prong of the *Terry* test—whether the detention was reasonably related in scope to the circumstances which justified the interference in the first place.

Subsequent to the *Terry* decision, the United States Supreme Court has attempted to clarify this prong of the two-part test. In *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d. 229, 103 S. Ct. 1319 (1983), the Court determined "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope *and* duration to satisfy the conditions of an investigative seizure." (Emphasis added.) 460 U.S. at 500. Regarding the limitation on the duration of the traffic stop, the Court stated that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 460 U.S. at 500.

To determine whether law enforcement officers have complied with the temporal limitation articulated for evaluating the propriety of a *Terry* stop, courts must "take into account whether the police diligently pursue[d] their investigation." *United States v. Place*, 462 U.S. 696, 709, 77 L. Ed. 2d 110, 103 S. Ct. 2637 (1983). Specifically, courts examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686, 84 L. Ed. 2d 605, 105 S. Ct. 1568 (1985).

Applying these cases to traffic stops, Kansas appellate courts have defined the *Terry* test to mean that a law enforcement officer may request the motorist's driver's license, car registration, and proof of insurance; conduct a computer check; issue a citation; and take those steps reasonably necessary to protect officer safety. The stop can last only as long as necessary to complete those tasks, and those tasks must be diligently pursued. *Thompson*, 284 Kan. at 774; *DeMarco*, 263 Kan. at 734; see also K.S.A. 22-2402(2) (during a *Terry* stop, if an officer "reasonably suspects that such officer's personal safety requires it, such officer may frisk such person for

firearms or other dangerous weapons"). If no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay. *Thompson*, 284 Kan. at 774; *State v. Mitchell*, 265 Kan. 238, 245, 960 P.2d 200 (1998); see also *State v. Damm*, 246 Kan. 220, 224-25, 787 P.2d 1185 (1990) (after citation written, driver could not be detained while records of passengers checked).

Decisions of the Tenth Circuit Court of Appeals are in accord, and that court routinely states the same general rules. *E.g., United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004). The Tenth Circuit takes the view that " '[a] detention for a traffic citation can turn into a consensual encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.' [Citation omitted.]" *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006).

Before the decision in *Mena*, 544 U.S. 93, the Tenth Circuit restricted the scope of any questions asked during a traffic stop to those related to the purpose of the *Terry* encounter. This was held to include questions regarding identification and weapons; other investigatory questions were not allowed. See, *e.g., United States v. Holt*, 264 F.3d 1215, 1227, 1230 (10th Cir. 2001) (weapons), *modified by United States v. Stewart*, 473 F.3d 1265 (10th Cir. 2007).

After the *Mena* decision, the Tenth Circuit adopted a broader approach to a law enforcement officer's questioning during a traffic stop, holding "there is no Fourth Amendment issue with respect to the content of the questions" if the stop's duration is not extended. *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005); see also *Stewart*, 473 F.3d at 1268-69 ("suspicionless" questioning of a driver by law enforcement officer during course of traffic stop regarding weapons and contraband is not Fourth Amendment violation so long as it does not extend duration of

traffic stop); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258-59 (10th Cir. 2006) (quoting *Wallace*).

The Court of Appeals relied upon this contemporary line of Tenth Circuit decisions in holding that the scope restrictions previously enforced in Kansas were altered by *Mena*. The panel's reliance on these cases was misplaced, however. Generally, those cases involved fact patterns where law enforcement officers asked questions and developed a reasonable suspicion of criminal activity because of the answers. That is not the situation in this case where the State concedes there was no basis for the search other than consent.

In addition, the Court of Appeals' analysis does not consider a line of cases in which some panels of the Tenth Circuit have recognized a distinction between the permissibility of asking questions on any topic and of conducting a search based upon a question like "May I search?" In these cases, even though the Tenth Circuit panels allowed questions outside the purpose of a traffic stop, they held the searches were not constitutionally permissible. See *United States v. Valenzuela*, 494 F.3d 886, 891 n.2 (10th Cir. 2007) (recognizing and discussing distinction); *Guerrero-Espinoza*, 462 F.3d at 1304-08 (invalidating passenger's consent given after purpose of stop concluded because questioning extended stop that had not evolved into consensual encounter, and stating general rules regarding scope); *United States v. Yeomans*, 2007 WL 30032, at *4-5 (10th Cir. 2007) (unpublished) (rejecting passenger's argument that questions exceeded scope of stop but invalidating consent to search given during detention).

In reaching these holdings, each of the Tenth Circuit panels reiterated the pre-*Mena* view that a traffic stop must be completed and the driver's license returned before a search based upon consent could be valid. This conclusion was supported with precedent rooted in pre-*Mena* analysis, but there was no explanation of why the rule remains valid in light of the panel's expanded view regarding the permissible scope of a traffic stop. This lack of analysis leaves unanswered questions: Is the search invalid because the search exceeded the permissible scope of a *Terry* stop (as opposed to a question exceeding the scope)? Did the search impermissibly

extend the duration of the vehicle stop? Or, was the consent involuntary? The lack of clarification diminishes the persuasiveness of the Tenth Circuit cases and restrains us from resolving this case by simply citing those cases that are contrary to the Court of Appeals' decision.

Nevertheless, the Court of Appeals panel in this case incorrectly concluded that Tenth Circuit cases supported its holding. Consequently, the only remaining rationale for the panel's decision is its interpretation of *Mena*, an interpretation which we conclude was in error.

*Mena* was an action for damages under 42 U.S.C. § 1983 (2000). Iris Mena alleged the Fourth Amendment was violated when law enforcement officers detained her while they executed a search warrant in the house she occupied and, at the same time, asked her questions about her immigration status. She argued the questions were unrelated to the purpose of her detention, which was to look for deadly weapons and evidence of gang membership. 544 U.S. at 100-01. The federal court of appeals agreed. In addition, the court found the detention was not reasonable and that "the officers were required to have independent reasonable suspicion in order to question Mena . . . because the questioning constituted a discrete Fourth Amendment event." 544 U.S. at 100-01. See *Mena v. Simi Valley*, 332 F.3d 1255, 1264-66 (9th Cir. 2003).

The United States Supreme Court reversed. Initially, the Court focused on the reasonableness of Mena's detention, finding: (1) *Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), allowed occupants of a residence to be detained while a search warrant was executed; (2) the degree of force was appropriate for the circumstances; and (3) the 2- to 3-hour duration was necessary given the nature of the search. 544 U.S. at 98.

In addition, the Court considered the issue of whether questioning was a discrete Fourth Amendment event requiring independent reasonable suspicion. It stated:

"The Court of Appeals also determined that the officers violated Mena's Fourth Amendment rights by questioning her about her immigration status during the detention. [Citation omitted.] This holding, it appears, was premised on the assumption that the officers were required to have independent reasonable suspi-

cion in order to question Mena concerning her immigration status because the questioning constituted a discrete Fourth Amendment event. But the premise is faulty. We have 'held repeatedly that mere police questioning does not constitute a seizure.' *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991); see also *INS v. Delgado*, 466 U.S. 210, 212, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984). '[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage.' *Bostick*, [501 U.S.] at 434-35 (citations omitted)." 544 U.S. at 100-01.

Consequently, the Supreme Court concluded the questioning did not create an additional seizure of Mena and, therefore, the law enforcement officers did not need reasonable suspicion to justify her interrogation. 544 U.S. at 101.

The *Mena* Court cited a traffic stop case, *Illinois v. Caballes*, 543 U.S. 405, 407, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005), as instructive. In *Caballes*, the Court held the Fourth Amendment does not require a reasonable, articulable suspicion to justify using a drug-detection dog to sniff the outside of a vehicle during a legitimate traffic stop as long as the duration of the stop is not extended. The Court concluded a dog sniff of a car's exterior did not compromise a legitimate privacy interest and, therefore, was not a search. 543 U.S. at 407.

The *Mena* Court's discussion of and reliance upon *Caballes* was limited to the question of whether, after the initial detention, there was an additional Fourth Amendment event—either a search (under the facts of *Caballes)* or a seizure (under the facts of *Mena*). Neither the *Mena* or the *Caballes* majority decisions discussed *Terry* nor the scope of a *Terry* stop. One of the *Caballes* dissenting opinions was based upon *Terry*, with the dissenters concluding the dog sniff exceeded the permissible scope of the *Terry* stop. The *Caballes* majority did not disagree with or even discuss this analysis. Rather, the majority's response seems to be a statement that the issue on which certiorari was granted "is narrow: 'Whether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop.' " 543 U.S. at 407.

Although *Terry* is not discussed in *Mena, Michigan v. Summers*, 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981)—the case

cited by the Court as precedent for its conclusion that Mena's detention was permissible—considered the application and rationale of *Terry*. In *Summers*, as in *Mena*, the Court considered the reasonableness of detaining occupants of a residence while a search warrant was executed. In Summers' case, he was descending the front steps of the residence when law enforcement officers encountered him, ordered him inside, and required him to remain during the search. The Court considered whether that initial seizure and the subsequent detention violated the Fourth Amendment.

Noting a general rule that probable cause must support a seizure if it is as intrusive as an arrest, the Court cited exceptions where the intrusion " 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable. [Citation omitted.]" 452 U.S. at 698. One such circumstance is a *Terry* stop, where the Court "recognized the *narrow* authority of police officers who suspect criminal activity to make *limited* intrusions on an individual's personal security based on less than probable cause." (Emphasis added.) 452 U.S. at 698. The Court emphasized the differences in the character of and justifications for the seizure in a *Terry* stop as compared to Summers' detention. Speaking of the detention at issue in *Summers*, the Court noted:

"Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself." 452 U.S. at 701.

Later in the opinion, the Court returned to this point, noting: "The existence of a search warrant, however, also provides an objective justification for the detention." 452 U.S. at 703. The Court also noted:

"[A] neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust

themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." 452 U.S. at 703-04.

Thus, in a *Summers* situation "the officer is not required to evaluate either the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." 452 U.S. at 705 n.19.

In contrast, in a *Terry* stop there is no warrant, and the stop occurs on the basis of a reasonable suspicion of a law enforcement officer rather than upon a showing of probable cause considered by a detached magistrate. As the Court pointed out in *Summers*, the Fourth Amendment allows such a stop because of its limited nature and because the officer's authority is narrow. 452 U.S. at 698, 700 n.11. This does not mean that the officer has no authority. In fact, the *Summers* Court noted several investigative techniques were available; " '[t]he most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained.' 3 W. LaFave, Search and Seizure § 9.2, pp. 36-37 (1978)." 452 U.S. at 700 n.12.

Limiting interrogation to the individual's identity and the circumstances of the suspicious conduct was consistent with the Court's discussion of balancing the interests required by the Fourth Amendment. This view of the limited and narrow scope of a *Terry* stop was reaffirmed in *United States v. Sharpe*, 470 U.S. at 682, 686-87, when the Court emphasized that traffic stops must be minimally intrusive, diligently pursued, and a law enforcement officer's actions must be reasonably related in scope to circumstances which justified the initial interference.

More recently, the limited nature of the scope of questioning during a *Terry* stop was addressed in *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185, 159 L. Ed. 2d 292, 124 S. Ct. 2451 (2004). In that case, law enforcement officers investigating an assault approached the defendant and asked for identification, which he refused to produce. He was arrested and convicted of obstruction based upon a Nevada statute that required individuals to identify themselves if requested to do so by an officer during a *Terry* stop. The Court described the Nevada statute as a

"stop and identify" provision and noted that many states have similar statutes. 542 U.S. at 182 (citing K.S.A. 22-2402[1] [2003]).

Hiibel argued (1) the request was not related to the purpose of the stop and, therefore, exceeded the constitutionally permitted scope of a *Terry* stop and (2) the refusal could not be criminalized in situations where there was no probable cause. The Court rejected both arguments under the facts of the case. Nevertheless, the analysis emphasized the limited nature of *Terry* inquiries.

The *Hiibel* Court began its analysis with the issue of whether the question was permissible. As the first step in answering this question, the Court considered whether asking the question constituted a seizure and concluded: " '[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.' *Delgado v. INS,* 466 U.S. 210, 216, 80 L. Ed. 2d 607, 104 S. Ct. 1758 (1975)." 542 U.S. at 185. *Delgado,* like *Mena,* focused on the issue of whether there was a seizure.

The next step of analysis in *Hiibel* marks the point where that decision (and this one) depart from *Delgado, Caballes, Mena,* and other cases addressing whether a discrete Fourth Amendment event has occurred. That next step is consideration of the constitutionally permissible scope of a *Terry* stop. The *Hiibel* Court noted: "To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be ' "justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." ' [Citations omitted.]" 542 U.S. at 185. The Court then noted that its "decisions make clear that questions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." 542 U.S. at 186.

Next, the Court addressed the second issue of whether the failure to respond to the request for identity could be criminalized. Noting that past decisions had left "an open question" of whether the suspect could be arrested and prosecuted for refusing to answer, the Court concluded "[t]he principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry*

stop." 542 U.S. at 187. The rationale of that conclusion was tied to the scope limitations of a *Terry* stop:

"The request for identity has an *immediate relation to the purpose, rationale, and practical demands* of a *Terry* stop. The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity. On the other hand, the Nevada statute does not alter the nature of the stop itself: it does not change its duration [citation omitted], or its location [citation omitted]. A state law requiring a suspect to disclose his name in the course of a valid *Terry* stop is consistent with Fourth Amendment prohibitions against unreasonable searches and seizures." (Emphasis added.) 542 U.S. at 188.

The Court recognized the defendant's argument that the statute "circumvents the probable-cause requirement, in effect allowing an officer to arrest a person for being suspicious." 542 U.S. at 188. In addressing this concern, the Court emphasized once again the limited nature of the *Terry* stop:

"Petitioner's concerns are met by the requirement that a *Terry* stop must be justified at its inception and *'reasonably related in scope* to the circumstances which justified' the initial stop. . . . Under these principles, an officer may not arrest a suspect for failure to identify himself if the request for identification is not *reasonably related to the circumstances* justifying the stop. . . . It is clear in this case that the request for identification was *'reasonably related in scope to the circumstances* which justified' the stop." (Emphasis added.) 542 U.S. at 188-89.

Four members of the Court dissented. Justice Stevens would have decided the case on Fifth Amendment grounds. Nevertheless, he noted that under *Terry* a law enforcement officer's question " 'must be "reasonably related in scope to the justification for [the stop's] initiation." ' [Citation omitted.]" 542 U.S. at 193 (Stevens, J., dissenting). In a separate dissent, three other justices concluded that criminalizing a failure to answer the question violated the limitations imposed in *Terry* and its progeny. 542 U.S. at 198 (Breyer, J., dissenting, joined by Souter and Ginsburg, JJ.). Thus, the entire Court, in some form, reaffirmed the significant limitations on the scope of a *Terry* stop and did so in a manner consistent with Kansas' application of that limitation.

The opinion in *Hiibel* was filed on June 21, 2004. Approximately 6 months later, the Court decided *Caballes* (January 24, 2005) and 9 months later *Mena* (March 22, 2005). In those later opinions, the

Court limited the issue to whether there was a discrete Fourth Amendment event—a search or a seizure—and did not address the scope of a *Terry* stop. In light of its recent reaffirmation of *Terry* principles in *Hiibel* and the careful limitation of the issue in *Caballes* and *Mena* to the question of whether there was an additional search or seizure, we are not persuaded that *Mena* can be read as an alteration or abandonment of the rules regarding the limited scope of a *Terry* stop.

Consequently, we hold that the Court of Appeals erred in ruling that *Mena* allows law enforcement officers to expand the scope of a traffic stop to include a search not related to the purpose of the stop, even if a detainee has given permission for the search. Rather, we continue to adhere to our longstanding rule that consensual searches during the period of a detention for a traffic stop are invalid under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights. The district court correctly applied these precedents and concluded the request and subsequent search of Smith exceeded the scope of the purpose of her detention.

### Was the Consent to Search Valid?

In addition, the district court concluded the consent to search was tainted by the impermissible detention. An unconstitutional seizure may infect or taint the consent to search as well as any fruits of the encounter if the nature of the seizure renders the consent to search involuntary. *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (officer's detention of person beyond limited restraint of *Terry* investigative stop taints subsequent consent to search); see *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure where the connection between the lawless conduct of law enforcement officers and the discovery of the challenged evidence has become so attenuated as to dissipate the taint. *State v. Reason*, 263 Kan. 405, 409, 951 P.2d 538 (1997); *State v. Ninci*, 262 Kan. 21, 32, 936 P.2d 1364 (1997); see *State v. Childers*, 222 Kan. 32, 40, 563 P.2d 999 (1977).

The district court concluded there was no causal break allowing a dissipation of the taint in this case.

In *Childers*, we stated that this determination is a question of fact that will not be disturbed on appeal if it is supported by the evidence. 222 Kan. at 40-41.

Clearly, in this case the undisputed evidence supports the conclusion there was no causal break that would purge the taint. Indeed, there was no break between the violation of the scope restrictions and the search; the two are inextricably entwined. In turn, the knowledge that the purse's contents revealed evidence of illegal conduct undoubtedly influenced Smith's decision to give a statement to police. Therefore, the evidence resulting from the search of Smith's purse was properly suppressed. See *Wong Sun*, 371 U.S. 471.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed and the case is remanded.

DAVIS and JOHNSON, JJ., not participating.

LARSON, S.J., and GREENE, J., assigned.