NOT DESIGNATED FOR PUBLICATION

No. 121,703

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MAEGAN R. BYARD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed October 9, 2020. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Natasha Esau*, assistant district attorney, *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., MALONE, J., and WALKER, S.J.

PER CURIAM: Maegen R. Byard appeals her convictions for possession of methamphetamine, drug paraphernalia, and marijuana. Byard challenges the district court's denial of her motion to suppress evidence seized during a vehicle search after a traffic stop. After a thorough review of Byard's claims, we find they lack merit and affirm the district court's refusal to suppress the evidence.

FACTS

On an evening in April 2018, Officer Cory Schmidt of the Hutchinson Police Department initiated a traffic stop of a black Kia Optima driven by Byard. Upon contacting Byard, Officer Schmidt detected the odor of unburnt marijuana. Relying on this odor for their probable cause, Officers Schmidt and Scott Finster searched the car, finding marijuana, methamphetamine, and multiple items of drug paraphernalia in the center console and inside Byard's purse. When the officers asked Byard about the items, she admitted using methamphetamine the previous weekend and said that anything in the vehicle was probably leftover from that time. Byard also said she had bought some marijuana earlier that day, but the marijuana in the car was from a previous day.

After the officers arrested Byard, the State later charged her with one count each of possession of methamphetamine, possession of drug paraphernalia, possession of marijuana, and driving while declared a habitual violator. At the preliminary hearing, Officer Schmidt testified that Byard's vehicle was failing to maintain its lane, so he conducted a traffic stop. When he contacted her, he detected the smell of unburnt marijuana. That prompted Schmidt to ask her to exit the vehicle and he "proceeded to search the vehicle under the *Carroll* doctrine." See *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925) (first recognizing "automobile exception," which allows warrantless search of vehicle based on probable cause); *State v. Howard*, 305 Kan. 984, 990, 389 P.3d 1280 (2017) (search of automobile permitted if there is probable cause; mobility of vehicle provides exigent circumstances without necessity of proving anything more).

*Byard moved to suppress the evidence*

As a pretrial matter, Byard moved to suppress the evidence from the search, arguing that Officer Schmidt lacked reasonable suspicion of a traffic violation to justify

the traffic stop. She contended the district court should suppress the evidence because it was obtained through an unlawful and unconstitutional search and seizure.

The district court held a hearing on the motion in January 2019, at which Officers Schmidt and Daniel Nowlan testified. The court also viewed a dash cam video from Officer Schmidt's patrol car and Officer Nowlan's body cam video. Because the testimony of the officers and the video evidence are critical in resolving the issues, we will review them in some detail.

*Testimony of Officers Schmidt and Nowlan*

Officer Schmidt testified that on that evening he was patrolling near the intersection of 17th and Severance in Hutchinson. While doing so, he noticed a black Kia travelling westbound that sped up to get through the traffic light at that intersection. He began following the vehicle "to make sure that no more traffic infractions were committed." Schmidt acknowledged "[t]hat itself wasn't a traffic infraction, but it was just enough to catch [his] attention." A few blocks later, at 17th and Cleveland, he noticed the vehicle's left tires go into a left turn lane without signaling and then continue to go straight through the intersection. The tires "completely went over the line" into the turn lane and Schmidt estimated "a quarter to a fifth of the vehicle" was in the turn lane. Traffic in the area was moderate to light, and there were no obstacles in the road that required Byard to move into the turn lane. Schmidt recognized that failing to maintain a single lane was a possible clue of impairment, so he continued following the Kia.

From there, Officer Schmidt testified the Kia continued traveling west. Then, just past the intersection of 17th and Plum the vehicle's left tires slightly crossed the double yellow line separating the westbound lane from oncoming traffic. There was an oncoming vehicle slowing down with its turn signal on, but Schmidt did not see where that vehicle turned because he was focusing on the Kia. Schmidt said he did not manually

3

activate his dash cam at that time because he "was still trying to determine, gather reasonable suspicion to stop the vehicle." Once he activated the emergency lights, the dash cam automatically began recording 30 seconds from that activation, which meant the very beginning of the dash cam video captured only the second incident at the intersection of 17th and Plum. The district court then admitted Officer Schmidt's dash cam video and viewed it during the hearing.

Officer Schmidt then testified that he contacted the driver of the Kia, who identified herself as Byard. Schmidt said he ran her name and information through dispatch and discovered she had a suspended Kansas driver's license and an outstanding warrant. Schmidt estimated he made that discovery "[w]ithin the first 5 to 10 minutes, probably."

On cross-examination, Officer Schmidt clarified that he activated his emergency lights only after he felt that there was reasonable suspicion of impaired driving. He said Byard's driving pattern resembled what he had seen of intoxicated drivers in the past. He believed that the two incidents of failing to maintain a lane could have led to an accident if he did not stop the vehicle.

As for the actions that first caught his attention, Officer Schmidt said he believed Byard was driving over the speed limit but did not have a functioning radar to verify his belief. He did not feel comfortable stopping her for speeding. Schmidt acknowledged that neither his initial report nor his testimony at the preliminary hearing included his observation that Byard initially sped up to get through the light.

As for the first instance of a potential lane violation, Officer Schmidt testified this instance was "minimal" as compared to "the grand scheme of things of criminal wrongdoing." He said it was a traffic infraction but did not stop Byard at this point because he was still gathering reasonable suspicion for driving under the influence. As

4

for the second instance of a potential lane violation, Officer Schmidt said he now believed Byard was putting others at risk, so he activated his emergency lights to begin the traffic stop.

Officer Nowlan, one of the backup officers who assisted with the traffic stop, also testified. He arrived after Officer Schmidt had already begun the stop and had his body cam activated upon arrival. Over Byard's objection, the district court admitted and viewed Officer Nowlan's body cam video as evidence.

*Dash cam video summary*

Officer Schmidt's dash cam video began at around 8:02 p.m., when the left tires of the Kia were already approaching the double yellow line separating the lanes. Within the first two seconds, the vehicle's left tires were fully over the yellow lines as an oncoming vehicle approached from the other lane moderately close to the Kia. About 10 seconds later, as Officer Schmidt continued following the Kia, he activated the emergency lights on his patrol car. Byard continued driving for about 20 more seconds before eventually turning and pulling off onto a side street, where Officer Schmidt finally contacted her.

Schmidt's dash cam video does not contain an audio track. Following the stop, Officer Schmidt can be seen on the video talking to Byard at the driver's side window, reviewing paperwork she handed him, and questioning her for several minutes after she stepped out of the Kia. About seven minutes into the stop Officer Nowlan and other backup officers arrived, and Schmidt and Nowlan are shown on the dash cam video searching Byard's vehicle.

5

*Body cam video summary*

Officer Nowlan's body cam video, which included audio, began at about 8:10 p.m. as he arrived at the traffic stop. As he walked up, Officer Schmidt could be heard explaining to Byard that they were going to search her vehicle. At the beginning of the search, Schmidt told Nowlan they were searching for marijuana and asked Nowlan, "Can you smell it?" Schmidt said, "It's not as strong now cause she's rolled down this window," and that he "smelled it when [unintelligible]."

The rest of the video showed the officers searching the vehicle and discovering small containers of methamphetamine and marijuana, as well as a burnt one-hitter pipe. After the search, Officer Schmidt could be seen Mirandizing and interrogating Byard, who eventually disclosed that she used methamphetamine that weekend, that she had bought marijuana earlier in the day, and admitting the contents of the vehicle belonged to her.

*District court's ruling*

After reviewing the testimony and videos and considering the parties' arguments on the motion to suppress, the district court ultimately denied the motion. The court began by noting that Officer Schmidt's testimony that he observed the Kia speed up to get through the intersection at 17th and Severance—presumably because of a yellow traffic light—"doesn't quite make sense because if the officer was behind her and he didn't see an infraction then that means he would have went through the red light." The court also pointed out that despite not mentioning it in his report or at the preliminary hearing, Schmidt testified he did not consider this initial incident to be a traffic violation.

As for the first instance in which Byard's vehicle briefly moved into the turn lane at 17th and Cleveland, the district court judge pointed out his own experience driving

through that intersection "would explain why [Byard] went over the line." The judge noted that

"17th is a two lane road and there is a short third lane to make the turn lane and what they do is they basically turn the straight through lanes outward so you actually have to make a small jog to the left [sic], and then make a jog back to the left. Having been on that road for 40-some years that if you just drive straight through and you're driving that, in fact, would explain why the defendant went over the line. Because she didn't, late at night, I don't suspect, I suspect if you go by there I suspect you could find a lot of cars that do that."

As for the second instance near 17th and Plum, the district court found the vehicle touched the double yellow line but the court "didn't see any danger to any of the vehicles" because "[t]here was no swerving or anything else." The judge then concluded the discovery of the outstanding warrant attenuated the search, explaining:

"So as far as the initial reasonable suspicion to stop, I find that extremely weak, but what the court's going to rely on is, I don't think the officer was acting in good faith. I think he was attempting to testify in a credible fashion and once they found there was an outstanding warrant then that would attenuate the search.

"And the reason I had it replayed is I don't, apparently Officer Schmidt didn't have his body cam on for some reason when he made his stop which might have been some benefit to the court. And he didn't testify he, Officer Schmidt didn't testify about the odor of alcohol—or the odor of marijuana. You had to glean that to make sure that he smelled it from the body cam of the second officer.

"But notwithstanding that, based upon the United States Supreme Court case that came down recently, once there was an arrest warrant for the defendant that attenuated any problems that existed in the search. And I would have to find that the officer acted in bad faith and I can't make that finding in this case."

The district court also issued a written order denying the suppression motion in March 2019. That order recited the following facts:

"Officer Schmidt was on routine patrol on April 22, 2018 at approximately 8:00 p.m. He observed the Defendant's vehicle speed up to make a traffic signal at 17th and Severance. The Officer decided to follow the vehicle.

"The vehicle was westbound on 17th Street. In the 700 block of 17th, Officer Schmidt observed the Defendant's vehicle substantially cross over into the turning lane. As the Defendant crossed the intersection of 17th and Plum, her vehicle's tires touched the center line. There was oncoming traffic at the time of the touching of the center line. At that time the officer made a determination to stop the vehicle."

The district court then made these findings:

"The Court finds the testimony of Officer Schmidt to be credible. The initial observation of speeding up to make a light is insufficient to warrant a traffic stop. The Officer then observed the Defendant's vehicle cross into the turning lane north of Graber School. The crossing into the turning lane was not incidental or minimal. A substantial portion of the vehicle entered the turning lane.

"There is video of the vehicle crossing the intersection of 17th and Plum. The vehicle did touch the center line as it exited the intersection. The failure to maintain lane was not as obvious as the prior failure to maintain lane of traffic. The video does substantiate the testimony of the officer concerning other traffic.

"While the traffic violations observed by Officer Schmidt were not egregious, they were sufficient to justify the stop of the Defendant's vehicle. Once the officer smelled the odor of marijuana, probable cause existed to allow a search of the vehicle. The motion to suppress is denied."

*Byard agreed to a bench trial on stipulated facts*

About two months after the written ruling, the parties agreed to a bench trial on stipulated facts. The stipulated facts provided the evidence presented at trial would show that Officer Schmidt initiated a traffic stop of Byard's vehicle for failure to maintain a lane of traffic; Schmidt detected the odor of unburnt marijuana coming from the vehicle upon contacting her; officers searched the vehicle and discovered methamphetamine,

8

marijuana, and drug paraphernalia; and Byard ultimately admitted the items discovered in the vehicle belonged to her. Byard also renewed her objection to the admission of the evidence, thus preserving the right to appeal the court's denial of the suppression motion.

At a hearing, the district court found Byard guilty of the charged offenses, except that the State amended the driving while a habitual violator charge to one count of driving while suspended. Based on her criminal history score of H, the court ultimately sentenced Byard to a controlling underlying sentence of 13 months' imprisonment for the possession of methamphetamine charge as the primary offense, running the other three charges concurrently, and setting aside the prison sentence for an 18-month probation term.

Byard timely appealed.

ANALYSIS

*Reasonable suspicion for the stop of Byard's vehicle*

Byard first argues the district court erred in denying her motion to suppress because Officer Schmidt lacked reasonable suspicion of criminal activity at the time of the traffic stop. She contends the traffic infraction statute relied on by the officer required the State to show "more than an incidental and minimal lane breach." *State v. Marx*, 289 Kan. 657, 674, 215 P.3d 601 (2016). Because the district court acknowledged the "unusual road design" contributed to the first instance of Byard's alleged failure to maintain a lane and the State "conceded the second instance was an incidental or minimal lane breach," Byard asserts the State failed to establish reasonable and articulable suspicion to justify the traffic stop.

9

In response, the State essentially argues that Officer Schmidt's testimony was not simply about the lane violations, but that the two instances of a lane violation led him to believe Byard may have been intoxicated.

When reviewing a district court's decision on a motion to suppress, we utilize a bifurcated standard. First, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. In reviewing the factual findings, we do not reweigh the evidence or assess the credibility of witnesses. Second, we then review the district court's ultimate legal conclusions de novo. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). Likewise, where the issue requires interpreting a statute, it presents a question of law subject to unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). And when faced with a motion to suppress evidence, the State bears the burden to prove that a search and seizure was lawful. *State v. Ton*, 308 Kan. 564, 568, 422 P.3d 678 (2018).

Similarly, when the parties do not dispute the material facts of the case, the suppression question becomes solely a question of law that this court reviews de novo. See *Hanke*, 307 Kan. at 827. That appears to be true here, since Byard does not dispute either instance in which her vehicle failed to maintain a single lane. Instead, she disagrees with the district court's ultimate legal conclusion that observing these two instances gave Officer Schmidt reasonable suspicion to justify the traffic stop.

A traffic stop is a seizure under the Fourth Amendment to the United States Constitution, so it is subject to the constitutional requirement of reasonableness. *State v. Smith*, 286 Kan. 402, 406, 184 P.3d 890 (2008). To justify this type of seizure, an officer needs only reasonable suspicion, which is "'a particularized and objective basis for suspecting the particular person stopped'" of breaking the law. *State v. Schooler*, 308 Kan. 333, 352, 419 P.3d 1164 (2018); see also K.S.A. 22-2402(1) (codifying the search

10

and seizure principles from *Terry v. Ohio*, 392 U.S. 1, 20-21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). Reasonable suspicion is a lower standard than probable cause, and

> "'[w]hat is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer.' The totality of the circumstances standard 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.' A reviewing court must give 'due weight' to the factual inferences drawn by both the district court and law enforcement officers. [Citations omitted.]" *Schooler*, 308 Kan. at 352.

The Kansas Supreme Court has also held that pre-stop observations of a traffic infraction establish an objectively reasonable justification to make a traffic stop, even if the stop is pretextual. *Marx*, 289 Kan. at 662.

Here, the parties agree that Officer Schmidt observed Byard's vehicle fail to maintain a single lane twice leading up to the traffic stop. The relevant Kansas statute for that violation is K.S.A. 2019 Supp. 8-1522(a), which provides: "A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

Thus the district court had to determine whether Officer Schmidt's testimony—that he observed Byard's vehicle partially cross into a left turn lane without turning—and the dash cam video showing her vehicle touching a double yellow center line a few blocks later were enough to meet the State's burden of proving there was reasonable suspicion of a violation of K.S.A. 2019 Supp. 8-1522(a). Byard argues that because the statute only requires a driver to maintain a lane "as nearly as practicable," the State needed to show "more than an incidental and minimal lane breach" to establish a violation. See *Marx*, 289 Kan. at 674. And since the State conceded the second instance captured on the dash cam video was only an incidental or minimal lane breach, Byard contends the State failed to

11

prove Officer Schmidt had reasonable suspicion based on the first instance. Her argument is unpersuasive to us.

Both parties recognize that the prior Kansas Supreme Court decision in *Marx*, 289 Kan. 657, controls this issue. In *Marx*, a deputy was providing roadside assistance to a motorist on the Kansas Turnpike when a passing motorhome lost a hubcap. The deputy retrieved the hubcap and drove to catch up with the motorhome and, in doing so, he noticed that the motorhome briefly crossed the fog line and then overcorrected and crossed the center line. He activated his lights to conduct a traffic stop and, ultimately, ended up searching the vehicle and discovering drugs and paraphernalia. The district court suppressed this evidence, finding in part that the State failed to carry its burden to prove the deputy had reasonable suspicion of a violation of K.S.A. 8-1522(a). After a panel of this court reversed that ruling on the State's interlocutory appeal, the defendants appealed to the Kansas Supreme Court, which reversed on the reasonable suspicion issue. 289 Kan. at 658.

Analyzing K.S.A. 8-1522(a), the Kansas Supreme Court rejected the view that a violation of this provision was a strict liability offense. The *Marx* court determined the statute essentially establishes two rules:

> "The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. *Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule*. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8-1522(a) when either rule of the road is violated." (Emphasis added.) 289 Kan. at 673.

The *Marx* court held that the language used—"as nearly as practicable"—"contradicts the notion that any and all intrusions upon the marker lines of the chosen travel lane constitute a violation." 289 Kan. at 674. Yet, "the statute even dilutes the practicability standard" because "[i]t only requires compliance with the single lane rule as *nearly* as practicable, *i.e.*, compliance that is *close* to that which is feasible." 289 Kan. at 674. So in other words, "an incidental and minimal lane breach" is not enough to establish a violation of K.S.A. 8-1522(a). 289 Kan. at 674.

The *Marx* court then found that the State failed to carry its burden of establishing the officer had reasonable suspicion of a traffic violation, since the officer's testimony was basically limited to his general observation about a singular instance of failing to maintain a single lane. The *Marx* court emphasized the lack of testimony proffered "from which the court could even infer that it was practicable to maintain a single lane" except the defendant's statement that the motor home was "'hard to drive.'" 289 Kan. at 675-76.

In our case, the dash cam video objectively proves that the second instance of failure to maintain a lane was indeed incidental or minimal and thus could not establish reasonable suspicion of a traffic violation based on *Marx*. That said, the reasonable suspicion analysis looks at *the totality of the circumstances*, so viewing either instance in isolation is inappropriate. See *Schooler*, 308 Kan. at 352. The proper inquiry requires us to determine whether the cumulative information leading up to the traffic stop would give an officer an objectively reasonable basis to make the stop.

Since there is no video evidence of the first instance of an alleged failure to maintain a lane, we defer to the district court's findings given Officer Schmidt's testimony. Officer Schmidt testified that Byard's vehicle "went completely over the line" and that about "a quarter to a fifth of the vehicle" moved into the turn lane. This movement was apparently significant enough that Schmidt also noted Byard did not activate her turn signal, suggesting he believed a turn signal violation could have been

occurring but for the vehicle continuing straight through the intersection. Finally, Schmidt said it was not windy and there were no obstacles or any other reason for Byard to enter the turn lane. So, contrary to Byard's assertion, Schmidt's testimony suggests this first instance was more than an incidental or minimal lane breach and that it was practicable for her to maintain a single lane at that point.

Byard contends the district court's comments about the "unusual road design" of the intersection at the first instance undercuts the officer's testimony that it was practicable to maintain a single lane. She points out that the district court judge took judicial notice of his own experience driving through that particular intersection, noting the road design and time of day "would explain why the defendant went over the line" and that "I suspect you could find a lot of cars that do that."

This argument has some merit. We concur the district court may have overstepped its authority by relying, at least in part, on its personal familiarity with the two intersections where the lane violations were alleged to have occurred. In *State v. Smith*, 308 Kan. 778, 784, 423 P.3d 530 (2018), our Supreme Court held that, under our rules, "'[a] judge . . . shall consider only the evidence presented and any facts that may properly be judicially noticed,'" and it determined that the district court had not met the substantive requirements of the judicial notice statute, K.S.A. 60-409(b)(4). That also appears to be the case here. But Byard did not register a contemporaneous objection to the district court's reference to its experiences during the suppression hearing. Additionally, as we have noted, Byard concedes that Officer Schmidt did, in fact, observe her failure to maintain a single lane of travel twice leading up to the traffic stop. Under these circumstances, we believe Byard has effectively waived her right to complain about the judge's interjection of his personal observations.

But even if we consider these comments by the district court to be improper, it does not automatically mean it was *impracticable* for Byard to maintain a single lane.

14

Other than referencing *Marx*, Byard provides no authority finding that the particular design of a road can make it impracticable to maintain a single lane. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019).

Although we have not found any published decisions in Kansas directly addressing the particular design of a road as a relevant factor, our court has affirmed a reasonable suspicion finding several times based on similar facts. See *State v. Miles*, No. 114,544, 2017 WL 383790, at *7 (Kan. App. 2017) (unpublished opinion) (driver crossed into passing lane on highway only once before returning to original lane, but "to such a degree that the officer believed that [he] may have failed to signal a lane change"); *State v. Neuman*, No. 112,933, 2015 WL 5311263, at *3 (Kan. App. 2015) (unpublished opinion) (driver crossed over line separating highway from shoulder three separate times). These unpublished opinions have no precedential value but can still offer guidance where they have "persuasive value with respect to a material issue not addressed in a published opinion of a Kansas appellate court [and] . . . would assist in disposition of the issue." Supreme Court Rule 7.04(g)(2)(B) (2020 Kan. S. Ct. R. 47).

Likewise, panels of our court have upheld convictions of K.S.A. 8-1522(a) on similar facts. See *State v. McGregor*, No. 107,855, 2013 WL 1010590, at *4 (Kan. App. 2013) (unpublished opinion) (video evidence showed tires touching the fog line and body of the vehicle travelling beyond fog line, the road was clearly marked and there were no obstructions, and that there were three such breaches in just three miles); *State v. Sullivan*, No. 104,343, 2011 WL 3795480, at *3 (Kan. App. 2011) (unpublished opinion) (officer observed driver fail to maintain lane multiple times over course of several miles and officer testified nothing prevented driver from maintaining lane). Despite *McGregor* and *Sullivan* examining the sufficiency of the evidence to support a conviction, the considerations made in those cases help us understand what constitutes a violation of

15

K.S.A. 2019 Supp. 8-1522(a). Ultimately, those considerations assist in determining whether the officer here had reasonable suspicion to believe a traffic violation occurred.

Simply put, Officer Schmidt's testimony about the first instance of a failure to maintain a lane is enough to establish reasonable suspicion in this case. Schmidt essentially said that he observed Byard's vehicle driving through an intersection while occupying two lanes for no apparent reason, which violates K.S.A. 2019 Supp. 8-1522(a).

But even if we held to the contrary and found the first instance was merely an incidental or minimal lane breach, the fact that Officer Schmidt witnessed two such breaches in a relatively short time period is notable. Under the totality of the circumstances, we believe Officer Schmidt's observations would support his belief that Byard demonstrated signs of possible intoxication. Decisions by several panels of our court would agree with that conclusion. See *Miles*, 2017 WL 383790, at *7; *Neuman*, 2015 WL 5311263, at *3. As a result, we find the district court did not err in concluding there was reasonable suspicion to initiate a traffic stop in this case. Thus, the district court correctly decided the motion to suppress should be denied.

*The Attenuation argument*

In her second issue on appeal, Byard contends that the district court erred by relying on the attenuation doctrine to find that the outstanding arrest warrant rendered harmless any constitutional deficiency in the search of Byard's vehicle. But the attenuation doctrine only applies when there has been an illegal search or seizure. *State v. Ellis*, 311 Kan.925, __, 469 P.3d 65, 78 (2020) ("[O]nce an officer has legal grounds to conduct an investigatory detention, the officer is free to check the person for outstanding warrants as part of the investigation."); see *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2062, 195 L. Ed. 2d 400 (2016) (police have obligation to arrest detainee upon discovery of warrant). But based upon our finding on Byard's first issue that Officer Schmidt's stop

of Byard's vehicle was lawful and properly based on reasonable suspicion, Byard's contention is moot, and we need not address her argument.

Affirmed.