NOT DESIGNATED FOR PUBLICATION

No. 121,308

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

PARIS A. FOLLMAN,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed November 22, 2019. Affirmed.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Jennifer Lautz*, of StrongPoint law, of South Hutchinson, for appellee.

Before MALONE, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: During a routine traffic stop, a sheriff's deputy developed reasonable suspicion that Paris Follman's truck contained drugs. The deputy employed various investigatory tactics he had learned at a training seminar in an effort to prolong the stop and gain Follman's consent to search the truck. But after 30 minutes, Follman refused consent, and the deputy requested a drug dog. Because the dog was in another county, this request extended the stop by another 50 minutes. The district court ruled that the stop's duration—which lasted more than 80 minutes—combined with the dilatory tactics the deputy used before requesting the dog's assistance rendered Follman's

1

detention unreasonable, violating the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights. The court thus suppressed the evidence seized after the drug dog's eventual alert. We affirm.

FACTUAL BACKGROUND

At 1:11 a.m. on May 19, 2018, Deputy Mikel Bohringer of the Reno County Sheriff's Department pulled over a truck for speeding. The deputy asked the driver, Paris Follman, for her license and vehicle registration. Follman, who identified herself as Kayla Martin, could not provide a driver's license; instead, she gave the deputy a credit card bearing the name Kayla Martin and a U-Haul rental agreement. The deputy— employing tactics he learned at a two-day highway interdiction seminar—asked Follman to come to his patrol car (where he said he had left his pen) while he filled out a traffic warning. At the suppression hearing, the deputy stated he asked Follman to come to his patrol car as part of a strategy to prolong the stop for a drug investigation.

During the encounter, the deputy noticed several indications that Follman might be transporting drugs. First, the car had an Arizona license plate. This indicated drug activity because western states are considered drug source states. Second, the car contained very little luggage, which appeared inconsistent with his professional observations and personal use of U-Hauls. Third, the rental agreement was suspicious: The agreement was for a rental to be picked up in Rosemead, California, on May 14 and returned four hours later. The vehicle was more than four days overdue and halfway across the country. Finally, the car contained several open food containers; this was counter to his experience with the cleanliness of rental vehicles and indicated they were not stopping often. The deputy also noticed Follman appeared nervous throughout the encounter.

In his patrol car, the deputy obtained information from Follman needed to fill out a traffic warning, but instead of writing this information on the warning form, he wrote her

2

answers in a notebook. While transferring the information from the notebook to the warning, he began asking questions unrelated to the traffic violation, questions Follman was slow to answer. At 1:26 a.m.—15 minutes into the stop—the deputy ran Follman's given pseudonym and date of birth for warrants. At the suppression hearing, the deputy admitted he delayed calling dispatch with the name Follman had given so he could ask her about her travel plans while filling out the warning. Under the guise of checking the year of the rental car, he left his patrol car, opened the rental car's passenger door, and used his flashlight to look inside. He also briefly questioned the passenger, Shane Britton.

At 1:30 a.m., the deputy advised Follman she was free to leave. But as Follman was leaving the patrol car, Deputy Bohringer asked if she would answer additional questions. She agreed and reentered the car. He asked whether she had any drugs and if she would consent to a search of the rental car; Follman denied possessing drugs and did not consent to a search. Bohringer then went to the rental car and questioned Britton; his answers were inconsistent with answers Follman had given. At 1:38 a.m., the deputy returned to the patrol car and informed Follman of Britton's answers and the deputy's suspicions. He again asked for her consent to search the car, and she again refused.

At 1:41 a.m.—30 minutes into the stop—the deputy requested the assistance of a drug dog. He advised Follman she was being detained and provided *Miranda* warnings.

Deputy Colt Pfautz, a canine handler with the Harvey County Sheriff's Office, received Bohringer's request. Pfautz made the 60-mile trip to Bohringer's location in approximately 45 minutes, arriving at 2:31 a.m.—now 80 minutes after the initial stop. Three minutes later, Pfautz's dog, Odie, indicated the presence of drugs inside the rental car. Upon searching the car, Bohringer discovered methamphetamine, marijuana, and Follman's actual identification.

The State charged Follman and Britton with various drug offenses. Follman subsequently moved to suppress the drugs as evidence. The district court granted the motion, finding the stop was unreasonable. Relying on Deputy Bohringer's dashcam footage, the court found the deputy had reasonable suspicion to extend the initial traffic stop based on the rental agreement, Follman's inability to provide a driver's license, and her hesitant answers which conflicted with Britton's responses. But the court found the detention to be unreasonable due to its duration and several actions by the deputy that the court found to be unnecessary and dilatory. The court therefore suppressed the evidence seized as a result of the search. The State then filed this interlocutory appeal.

DISCUSSION

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment's Due Process Clause, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Section 15 of the Kansas Constitution Bill of Rights provides "the same protection from unlawful government searches and seizures as the Fourth Amendment." *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010).

Because a routine traffic stop constitutes a seizure, such a stop must be reasonable. *State v. Smith*, 286 Kan. 402, 406, 184 P.3d 890 (2008). Courts gauge the reasonableness of a traffic stop on its scope and duration. *State v. Thompson*, 284 Kan. 763, 774, 166 P.3d 1015 (2007). Traffic stops are generally limited to "(i) checking the driver's license; (ii) determining whether there are outstanding warrants against the driver; and (iii) inspecting the automobile's registration and proof of insurance." *State v. Jimenez*, 308 Kan. 315, Syl. ¶ 3, 420 P.3d 464 (2018).

An officer may inquire about subjects unrelated to the purpose of a traffic stop if doing so does not measurably extend the stop's duration. *State v. Morlock*, 289 Kan. 980,

4

Syl. ¶ 4, 218 P.3d 801 (2009). But if an officer obtains reasonable suspicion of another crime during the course of a traffic stop, the officer may extend the stop for a reasonable period of time in order to investigate that suspicion. *State v. Anderson*, 281 Kan. 896, 902, 136 P.3d 406 (2006). Reasonable suspicion requires "'"a particularized and objective basis" for suspecting the person stopped of criminal activity.'" *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996]).

A seizure "'should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *United States v. Sharpe*, 470 U.S. 675, 693-94, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (Marshall, J., concurring) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 [1983]). Courts assess reasonableness based on the totality of the circumstances. While the duration of a detention is an important factor in the reasonableness analysis, *Sharpe*, 470 U.S. at 685, reasonableness also turns on whether officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." 470 U.S. at 686. The diligence inquiry "is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." 470 U.S. at 687.

To deter violations of the Fourth Amendment by law enforcement, courts hearing criminal cases exclude—or suppress—evidence found as a result of an unlawful search or seizure. *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). This exclusion applies both to "'primary evidence obtained as a direct result of an illegal search or seizure'" and to "'evidence later discovered and found to be derivative of an illegality.'" 136 S. Ct. at 2061 (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 [1984]). Although courts generally refer to this practice as the exclusionary "rule," the Supreme Court has recently emphasized that it is a judicially created remedy and only applies when "'its deterrence benefits outweigh its substantial

5

social costs.'" *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591, 126 S. Ct. 2159, 165 L. Ed. 2d 56 [2006]). In other words, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

We review the factual underpinnings of a district court's decision on a motion to suppress evidence for substantial competent evidence and its ultimate legal conclusion de novo. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When the material facts are not in dispute—as here—whether evidence should be suppressed is a question of law over which our review is unlimited. *State v. Stevenson*, 299 Kan. 53, 57-58, 321 P.3d 754 (2014). Although a defendant initiates a constitutional challenge to a search or seizure by filing a motion to suppress the evidence in question, the State has the burden to prove any challenged police conduct was permissible. *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016).

Here, the district court found that Deputy Bohringer had reasonable suspicion to extend the stop for investigatory purposes beyond the scope of the initial traffic stop. But the court ruled that the investigatory detention was nevertheless unreasonable in violation of the Fourth Amendment. In particular, the duration of the stop—over 80 minutes, including a 50-minute wait between the request for a drug dog and the dog's arrival from another county—coupled with the deputy's stalling strategies rendered the detention unconstitutional. Based on our review of the circumstances in this case, we agree.

The United States Supreme Court has explained that reasonableness in the Fourth Amendment context depends, among other things, on whether officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686. That inquiry "is not simply whether some other alternative was available, but

6

whether the police acted unreasonably in failing to recognize or to pursue it." 470 U.S. at 687. Individually, none of the deputy's actions appear unreasonable. But the combination of his tactics, compounded by the 50-minute delay before the drug dog's arrival, rendered the stop unconstitutional.

The deputy here testified that, almost from the outset of the stop, he suspected the U-Haul truck contained drugs. He developed this suspicion based on his various observations of the vehicle and the rental agreement; his suspicion increased after Follman and Britton provided divergent explanations of their travel plans. Yet—even though his jurisdiction apparently relied on a drug dog assigned to several counties in central Kansas—the deputy did not request the drug dog from the outset. Instead, he used various stalling tactics to see if he could obtain Follman's consent to search the truck. And even when Follman initially refused consent, he did not request Canine Odie's assistance; he only did so after several more minutes when Follman again refused to consent to a search. As a result of this strategy, the deputy did not request the drug dog's assistance until 30 minutes into the stop. And then, based on Odie's location, it took another 50 minutes before the dog could arrive to investigate the deputy's suspicion. The combination of these factors, which significantly prolonged the already extended duration of the stop, rendered the detention in this case unreasonable.

Based on these circumstances, we agree with the district court's conclusion that Follman's detention violated her rights under the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights. The State does not argue any exception to the exclusionary rule that would allow the evidence obtained from this unlawful detention to be admitted. Thus, the district court properly granted Follman's motion to suppress.

Affirmed.