NOT DESIGNATED FOR PUBLICATION

No. 121,412

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JILL ANN MCCLUNG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed September 10, 2021. Affirmed.

*Clayton J. Perkins*, of Capital Appellate Defender Office, for appellant.

*Emma Halling*, assistant district attorney, *Suzanne Valdez*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE, J., and BURGESS, S.J.

PER CURIAM: Jill Ann McClung appeals her convictions for one count of possessing methamphetamine with intent to distribute, one count of possessing drug paraphernalia, and three counts of unlawfully distributing methamphetamine using a communication facility. She argues that we should reverse her convictions for three reasons: (1) the district court wrongly denied her motion to suppress the items removed from her car; (2) the district court wrongly admitted into evidence, over her hearsay objection, a report on her cell phone's text message exchanges; and (3) the prosecutor

1

committed several instances of error during closing arguments. We find McClung's arguments unpersuasive and affirm her convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2016, Detective Kimberlee Nicholson of the Lawrence Police Department began investigating McClung as a potential drug dealer. Through this investigation, she received information that McClung was distributing methamphetamine to Anthony Sutton. Sutton lived in a house located on Illinois Street in Lawrence.

On December 21, 2016, at approximately 6:30 p.m. to 7 p.m., Detective Nicholson observed a woman who she believed to be McClung driving a gold Toyota Avalon to Sutton's house. According to the detective, Sutton left the house and entered the car, then a few minutes later both Sutton and the woman exited the car and entered Sutton's house. The detective continued her surveillance of Sutton's house until around 10:30 p.m. At that time, she radioed Officers Shannon Riggs and Matthew Weidl, who had been assisting her investigate the woman she believed to be McClung. She told the officers that McClung had just exited Sutton's house with two other people and drove off in McClung's car. The detective asked the officers to attempt a traffic stop.

Shortly after receiving the radio call, Officer Riggs noticed the car drive by and that the left taillight was broken. Officer Riggs decided to stop McClung's car based on the broken taillight. Because he had previously searched McClung's name in the police computer system, he also knew that her driver's license was expired.

As Officer Riggs approached McClung's car, he noticed that the man in the backseat was moving around a lot, which made him suspect that the man was hiding something. As he approached, Officer Riggs noticed that the driver opened her door. The

officer became suspicious because, in his experience, most people simply roll down their windows to talk during a traffic stop.

When McClung opened the driver's door, Officer Riggs asked her to exit the car so he could show her the broken taillight. At that time, McClung told Officer Riggs that she already knew that the taillight was broken because she had accidently reversed the car into a dumpster. When the officer asked her for her driver's license, McClung only produced a Kansas identification card. When Officer Riggs asked the passengers in the car to roll down their windows so they could talk to Officer Weidl and Officer Kristen Kennedy, who arrived on the scene about a minute into the stop, McClung interrupted Officer Riggs. She told the passengers they did not have to speak to him. When Officer Riggs asked the passengers for their identification, McClung interrupted again. She told the passengers that they did not have to give their identification to the officer.

Because McClung had not produced a driver's license, had told the passengers not to produce identification, and was a suspected methamphetamine distributor, Officer Riggs decided to handcuff McClung and place her in his patrol car. As Officer Riggs did this, McClung protested and told him that she did not need a driver's license because she had a "constitutional right to travel."

Meanwhile, as Officer Riggs tried to move McClung away from her car to his patrol car, Officer Weidl began speaking to the passengers. Officer Weidl noticed that Officer Riggs was having trouble handcuffing McClung, so he went over to assist. After Officer Riggs had successfully handcuffed McClung, Officer Weidl, who had a K9 partner, returned to McClung's car to have the dog conduct a search.

Before conducting the dog sniff, Officer Weidl directed Pamela Arnold, who was sitting in the front passenger seat, and William Byrd, who was sitting in the backseat, to exit the car. Once Byrd had exited the car, Officer Weidl told Byrd that he was going to

pat him down for weapons. At this point, Byrd volunteered that he had a marijuana pipe on his person. Officer Riggs testified that by the time he was finished dealing with McClung at his patrol car, Byrd had already admitted to having a marijuana pipe on his person.

Upon Byrd's admission, Officer Weidl started searching McClung's car. The officer started by searching the backseat in the area where Byrd had been sitting. During this search, Officer Weidl discovered a case containing a pipe and a plastic baggie containing methamphetamine-like residue inside Byrd's boots.

Upon finding the drug paraphernalia and methamphetamine inside Byrd's boots, Officers Weidl and Kennedy decided to search the remainder of the car. During this search, Officers Weidl and Kennedy found a bag containing a methamphetamine-like substance and a digital scale covered in a methamphetamine-like residue in the locked glovebox, numerous plastic baggies inside McClung's purse, and McClung's cell phone. Both McClung's purse and cell phone were found sitting on top of the driver's seat in the car.

Once Officers Weidl and Kennedy finished searching the car, they allowed McClung to leave on her own accord. They told McClung that she could face criminal charges if lab testing showed that the substances seized from her car contained methamphetamine. Ultimately, Kansas Bureau of Investigation (KBI) lab testing established that the substances seized from McClung's car were methamphetamine. The baggie removed from McClung's locked glovebox had just over 10 grams of methamphetamine inside it. After obtaining a search warrant, the officers downloaded data from McClung's cell phone using Cellebrite software, indicating that the cell phone sent and received multiple messages about selling methamphetamine. Those text messages included: (1) a December 1, 2016 text message from McClung's phone to a contact named "Plumber" around 8 a.m., asking "Can I trouble you for a 20[?]"; (2) a

4

December 1 text message from an unknown sender to McClung's phone around 6 a.m. explaining that he or she had "someone who needs a ten"; (3) a December 12 text message from a contact named "Vinny" to McClung's phone around 3 a.m. asking, "What are [you] wanting for that or those sev[en?]"; and (4) a December 20 text message from an unknown sender to McClung's cell phone around 5 a.m. asking, "Hey, you wanna make a little money?"

As a result, the State charged McClung with one count of possessing methamphetamine with intent to distribute, one count of possessing drug paraphernalia, four counts of unlawfully distributing methamphetamine using a communication facility, one count of driving with an invalid license, and one count of driving with a defective taillight. The four counts of unlawfully distributing methamphetamine using a communication facility hinged on the four messages previously described.

After McClung was arrested, she moved to suppress all the evidence seized during the search of her car and its contents. In the motion, McClung argued that the police lacked probable cause to search her car and seize its contents. She asserted the search of her car and seizure of its contents occurred outside of the scope of the sole legitimate purpose of the traffic stop, which was to investigate her broken taillight. McClung argued that the district court should suppress all the evidence obtained during the search of her car and its contents because, during the search, the officers violated her rights as stated under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights.

In response the State countered that the search of McClung's car was legal because, during the stop, the officers "developed probable cause that criminal activity was afoot" when Officer Weidl discovered the marijuana pipe on Byrd. The State argued that because Officer Weidl found the marijuana pipe on Byrd, the officers developed probable cause to search the backseat area of the car where Byrd had been sitting. In

5

making this argument, the State alleged that Officer Weidl discovered the marijuana pipe on Byrd as Officer Riggs attempted to obtain information from McClung relating to the broken taillight and her expired driver's license, which the State argued were both legitimate reasons for the stop. The State then argued that after Officer Weidl discovered the drug paraphernalia and methamphetamine in Byrd's boots, the officers developed probable cause to search the remainder of McClung's car and its contents. The State argued that the district court should deny the suppression motion because the officers neither impermissibly extended the stop nor searched McClung's car without probable cause.

The district court held a hearing on McClung's suppression motion. At the hearing, the State presented testimony from Detective Nicholson, Officer Riggs, and Officer Weidl. During their testimony, they each explained their role in investigating McClung for methamphetamine distribution, stopping her car because of the broken taillight and her expired driver's license, and searching her car for contraband. At the end of the hearing, the district court relied on the officers' testimony to deny McClung's suppression motion. In denying the motion, the district court found that: the police had reasonable suspicion to stop McClung based on the broken taillight and her expired driver's license; upon Byrd's admission to possessing a marijuana pipe, the officers had probable cause to search for evidence of criminal activity in the backseat area where Byrd had been sitting; and upon the discovery of the methamphetamine and drug paraphernalia inside Byrd's boots, the officers had probable cause to search the remainder of McClung's car and its contents. The court further found that Officer Riggs' decision to detain McClung "until the situation was under control and the search was finished was reasonable."

A jury trial was held between March 25, 2019, and March 28, 2019. At trial, McClung's defense hinged on four contentions: (1) that all of the methamphetamine and paraphernalia that the officers found in her car the evening of December 21 belonged to Byrd; (2) that her cell phone had incriminating text messages about distributing

6

methamphetamine on it because all the people who lived at her house regularly used her cell phone; (3) that she had plastic baggies in her purse because she used them for selling jewelry online; and (4) that she had inadequate notice of her driver's license expiring. To support these contentions, McClung presented testimony from her daughter Jessie and Arnold.

Both Arnold and Jessie testified that McClung was at Sutton's house during the evening of December 21 because McClung had volunteered to help Sutton move. Arnold also testified that at the direction of Byrd she placed the items that were eventually seized, which were within a bag, in McClung's glovebox while helping Sutton move earlier that day. Arnold asserted that she did not tell McClung about putting Byrd's bag in the glovebox because she assumed the bag contained tools. Arnold also alleged that she did not think to tell McClung that she had placed Byrd's bag containing the methamphetamine and digital scale in her glovebox, at the direction of Byrd, until after the police had completed their stop. Jessie testified that many people used her mother's cell phone to communicate because it was the only cell phone in a house of at least five people, including herself and her sister Carly.

The State's case largely relied on the testimony of Detective Nicholson, Officer Riggs, and Officer Weidl. The State also presented the testimony of the forensic scientist who confirmed that the methamphetamine-like substances found in McClung's car were actually methamphetamine. In addition, the State presented testimony from the officer who compiled the Cellebrite report on McClung's cell phone data.

Before closing arguments, McClung announced that she was willing to plead guilty to having a defective taillight. As a result, the jury was not instructed on this charge. As to the remaining charges, the jury found McClung guilty of one count of possessing methamphetamine with intent to distribute, one count of possessing drug paraphernalia, and three of the four counts of unlawfully distributing methamphetamine

using a communication facility. The jury found McClung not guilty of one count of unlawfully distributing methamphetamine using a communication facility and one count of driving with an invalid license.

The district court sentenced McClung to a controlling term of 96 months' imprisonment followed by 36 months' postrelease supervision for the primary crime of possession of methamphetamine with intent to distribute, with the remaining convictions running concurrent to the controlling sentence.

McClung appeals.

ANALYSIS

I.   *The district court did not err by denying McClung's suppression motion.*

In her primary argument on appeal, McClung contends the district court erred when it denied the motion to suppress the evidence seized from her car. Although she concedes that Officer Riggs had reasonable suspicion to make the stop based on the car's broken taillight, she nonetheless argues that he impermissibly extended the stop. McClung argues that Officer Riggs' actions during the stop did not involve completing a traffic ticket for the broken taillight. In making this argument, McClung emphasizes that the district court never found that Officer Riggs had reasonable suspicion to make the stop based on the ongoing police investigation that she was a drug dealer. She asserts that the ongoing investigation into her alleged methamphetamine distribution did not provide the officers with reasonable suspicion to either make or extend the stop.

In challenging the district court's denial of her suppression motion, McClung further argues that once Officer Weidl arrived, he impermissibly extended the stop by ordering Byrd and Arnold out of the car. To support this argument, McClung points to Officer Weidl's testimony from the suppression motion hearing that he ordered Byrd and

8

Arnold out for *their* own safety as he prepared to conduct the dog sniff. She contends that Officer Weidl could not legally order Byrd and Arnold out of the car for their own safety. She contends that once Byrd was outside of her car, Officer Weidl lacked reasonable suspicion to pat him down. In addition, McClung argues that Officers Weidl and Kennedy's discovery of methamphetamine and drug paraphernalia in Byrd's boots did not "justify the search of the front of the car[,] including locked containers." According to McClung, "the mere fact that a backseat passenger in a car possessed paraphernalia does not provide probable cause to search the entire car for contraband." Finally, McClung argues that Officers Weidl and Kennedy also lacked probable cause to seize her cell phone from the car. This argument hinges on her contention that the State failed to present any evidence to support the seizure of her cell phone.

The State responds that contrary to McClung's arguments, the district court properly denied her motion to suppress the items seized from the car. The State argues that after Officer Riggs stopped McClung for the broken taillight and her expired driver's license, McClung's own uncooperative behavior resulted in extending the stop. The State argues that substantial competent evidence established that by the time Officer Riggs finished dealing with McClung's obstructive behavior, Byrd had already told Officer Weidl about the marijuana pipe. The State contends that the officers obtained probable cause to search the backseat of McClung's car under the automobile exception to the warrant requirement. In challenging McClung's complaints about Officer Weidl's dealings with Byrd, the State also contends that McClung lacks standing to argue that Officer Weidl somehow violated Byrd's constitutional rights by pointing to precedent that the Fourth Amendment is a personal right that must be invoked. See, e.g., *State v. Talkington*, 301 Kan. 453, 476-77, 345 P.3d 258 (2015).

Next, the State argues that upon finding the methamphetamine and drug paraphernalia in Byrd's boots, the totality of the circumstances provided the officers with probable cause to search the remainder of the car. Additionally, the State argues that the

9

officers had probable cause to seize McClung's cell phone because under the totality of the circumstances, there was a fair probability that the cell phone contained evidence of McClung facilitating the distribution of methamphetamine. The State stresses that the officers obtained a warrant before using the Cellebrite software on McClung's phone; thus, the officers' ultimate search of McClung's cell phone using the Cellebrite software is not at issue.

*Applicable Law*

When a defendant challenges the district court's denial of his or her motion to suppress, this court reviews the district court's fact-findings in support of its decision for substantial competent evidence. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). While engaging in this review, we must not reweigh the evidence or reassess the credibility of witnesses. When considering the district court's ultimate legal conclusion, we exercise unlimited review. 307 Kan. at 827.

"The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights assure each person's right to be secure in his or her person and property against unreasonable searches and seizures." *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). Traffic stops are seizures as meant under the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights; therefore, they must be supported by articulable facts sufficient to constitute reasonable suspicion. See *State v. Smith*, 286 Kan. 402, 406, 184 P.3d 890 (2008). Traffic stop seizures are "analyzed as being more akin to an investigatory detention than an arrest. As a result, courts examine the reasonableness of a traffic stop under the principles set forth in *Terry v. Ohio*, 392 U.S. 1[, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]." *Smith*, 286 Kan. at 406.

Under *Terry*, courts utilize a two-step process to analyze the propriety of an officer's actions in making a traffic stop. First, the court must consider whether the

10

officer's initial stop was justified. Second, the court must determine whether the length and scope of the traffic stop were reasonably related in scope to the circumstances that justified the traffic stop in the first place. *Smith*, 286 Kan. at 407. It is settled law that during a traffic stop an "officer may request the motorist's driver's license, car registration, and proof of insurance; conduct a computer check; issue a citation; and take those steps reasonably necessary to protect officer safety." 286 Kan. at 410. The traffic stop may last only as long as required for the law enforcement officer to diligently complete those tasks. 286 Kan. at 410. Even so, "[a]n officer's inquiries or actions unrelated to the justification for the initial traffic stop do not convert the stop into an unlawful seizure so long as they do not measurably extend or prolong the stop." *State v. Coleman*, 292 Kan. 813, 816, 257 P.3d 320 (2011).

"If no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay." *Thompson*, 284 Kan. at 774. But an officer may expand his or her investigative detention beyond the purpose of the initial traffic stop if the officer has an objectively reasonable and articulable suspicion that some other criminal activity is taking place. *Coleman*, 292 Kan. at 816-17.

Unless a recognized exception allows for a warrantless search, a police officer's warrantless search of a person or property is unreasonable. *State v. Knight*, 55 Kan. App. 2d 642, 646, 419 P.3d 637 (2018). "Kansas has recognized several exceptions to the Fourth Amendment search warrant requirement: consent, search incident to a lawful arrest, stop and frisk, probable cause plus exigent circumstances, the emergency doctrine, inventory searches, plain view or feel, and administrative searches of closely regulated businesses." 55 Kan. App. 2d at 646. Under the probable cause plus exigent circumstances exception, "the police may search without a warrant when they have probable cause to search—meaning there is a fair probability that the police will find

11

evidence of a crime—and exigent circumstances." 55 Kan. App. 2d at 646. When the place being searched is a car, the mobility of the car creates the exigent circumstances. As a result, there is an automobile exception to the warrant requirement. For this reason, when the place being searched is a car, the only question courts must consider is whether the police had probable cause to conduct the search. 55 Kan. App. 2d at 646-47.

In analyzing whether the totality of the circumstances provided a police officer with probable cause to search a car, courts must consider "'all of the information in the officer's possession, fair inferences therefrom, and any other relevant facts, even if they may not be admissible on the issue of guilt.' [Citation omitted.]" 55 Kan. App. 2d at 647. Also, in analyzing whether the totality of the circumstances provided an officer with probable cause to search a car, the scope of the warrantless search "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." 55 Kan. App. 2d 642, Syl. ¶ 5. This means that the police may search a particular part of a car as long as they have probable cause to do so; the police must not search any area of the car in which they do not have probable cause to search. 55 Kan. App. 2d at 648.

*Suppression Motion Properly Denied*

McClung argues that the district court erred by denying her motion because nothing Officer Riggs did during the stop involved his original "traffic stop mission." According to McClung, the officer validly stopped her based on the car's broken taillight, but everything he did, including making her step away from the car, was "unrelated to the traffic mission." In making this argument, McClung points to Officer Weidl's testimony that he believed Byrd told him about his marijuana pipe about "[a] couple minutes" after he assisted Officer Riggs with detaining the uncooperative McClung. McClung cites this testimony as well as Officer Riggs' testimony that the original purpose of the stop was put

12

"on hold" upon the discovery of Byrd's marijuana pipe as proof that the officers never engaged in the original traffic-related purposes of the stop.

This argument ignores the fact that the district court found that there were two purposes for stopping McClung—the car's broken taillight *and* her expired driver's license. The time needed for the officer to diligently investigate the broken taillight and McClung's expired driver's license controlled the legitimate scope of the stop. Accordingly, despite McClung's suggestion otherwise, the car's broken taillight was not the only valid reason why the officer initiated the stop.

McClung's first argument wholly ignores the role her behavior had in extending the duration of the stop. At the suppression hearing, Officer Riggs testified that as he approached the car immediately after making the stop, McClung opened the driver's door instead of rolling down the window, which was "fairly rare" behavior. He testified that when he contacted McClung, he asked her to get out of the car so he could show her the broken taillight. Officer Riggs stated that although McClung complied with this request, she refused the request to produce a driver's license. He further recalled that McClung gave him a Kansas identification card, but she "never" provided him with her driver's license. He also testified that he only sought to move McClung away from the car over to his patrol car after she interrupted his attempts to speak with Arnold and Byrd by telling them that they did not have to speak to him or comply with his identification request.

Police officers may ask drivers for their driver's licenses as part of a routine traffic stop. *Smith*, 286 Kan. at 410. In this case, Officer Riggs had reasonable suspicion to believe that McClung's driver's license had expired. His request for McClung's driver's license was reasonably related to the legitimate scope of the stop. Officer Riggs' actions relating to obtaining McClung's driver's license did not prolong the stop in a manner that infringed upon McClung's rights under the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights.

Officer Riggs indicated that McClung was uncooperative the moment he contacted her. Although McClung may have been unhappy about the stop, the officer had the authority to ask her to exit the car. See *State v. Lutz*, 312 Kan. 358, 366, 474 P.3d 1258 (2020) ("Removal of the vehicle's occupants, including passengers, is permitted pending completion of the traffic stop."). In spite of McClung's protestations that Arnold and Byrd did not have to provide their identification, Officer Riggs had the authority to ask for such identification. See *State v. Jones*, 27 Kan. App. 2d 476, Syl. ¶ 4, 5 P.3d 1012 (2000) ("A police officer, while making a routine and lawful stop of a vehicle for a traffic violation, may ask passengers in the vehicle for identification in order to complete his or her record of the traffic citation and to note the witnesses to the traffic stop."). When Officer Riggs made McClung move from outside of the car to his patrol car, he did so because McClung had obstructed his completion of the routine tasks related to the investigation of the broken taillight and expired driver's license.

The district court also found that Officer Weidl's interaction with Byrd did not impermissibly extend the stop. Although McClung claims that Officer Weidl testified that Byrd told him about his marijuana pipe "[a] couple minutes" after he assisted Officer Riggs with handcuffing the uncooperative McClung, Officer Weidl's testimony does not mean the officers impermissibly extended the scope of the stop. McClung seemingly asserts that Officer Riggs impermissibly extended the scope of the stop because he never testified that he was doing anything related to the "traffic mission" during the couple of minutes after Officer Weidl assisted him with handcuffing her. This is not supported by the testimony of Officers Riggs and Weidl at the suppression hearing.

Officer Weidl's testimony suggests that he helped Officer Riggs place McClung in handcuffs, but he did not help place McClung in the patrol car. Officer Riggs' testimony establishes that after McClung was handcuffed, he had Officer Kennedy pat her down for officer safety purposes before he placed McClung in the patrol car. Thus, there was

14

obviously time between when Officer Weidl assisted Officer Riggs with handcuffing McClung and when Officer Riggs placed the handcuffed McClung in his patrol car. In turn, per Officers Riggs' and Weidl's testimony, there was a period of time when Byrd could have revealed his marijuana pipe possession before Officer Riggs had even placed McClung in his patrol car so he could continue with the routine tasks of the stop. Officer Riggs' testimony supports this premise when he stated that by the time that he had "seated [McClung] into the front seat of [his] patrol car," "Officer Weidl . . . had found . . . a drug pipe on one of the passengers."

The evidence supports that after Officer Riggs validly stopped McClung for having a broken taillight and having an expired driver's license, she obstructed the officer's completion of the stop. There is evidence to support that Byrd revealed to Officer Weidl that he possessed a marijuana pipe during the period in which Officer Riggs continued to deal with McClung's uncooperative behavior. Although McClung contends that Officer Riggs must have extended the stop because his actions during the stop were unrelated to his "traffic mission," his actions of trying to obtain McClung's cooperation and driver's license were related to the original purposes of the stop. Substantial competent evidence supports that Byrd told Officer Weidl about being in possession of a marijuana pipe as Officer Riggs continued to complete tasks related to the broken taillight and McClung's expired driver's license. In denying the suppression motion, the district court correctly rejected McClung's argument that Officer Riggs' conduct impermissibly expanded the legitimate scope of the stop.

Turning to McClung's second argument about the denial of her suppression motion, she argues that the district court erred by denying the motion because Officer Weidl impermissibly extended the stop by ordering Byrd and Arnold out of the car and then patting down Byrd. The State contends that McClung lacks standing to argue that Officer Weidl somehow violated Byrd's constitutional rights because the Fourth Amendment is a personal right. McClung responds that she is challenging a violation of

15

her own rights by arguing that the officers unlawfully expanded the scope of the stop by ordering her passengers out of the car and patting down Byrd.

The most significant problem with McClung's argument is that she is raising it for the first time on appeal. Although McClung now asserts that Officer Weidl could not order Arnold and Byrd out of the car and thereafter pat down Byrd, she did not make these arguments before the district court. McClung broadly argued before the district court that the officers' search of her car and seizure of its contents occurred outside of the scope of the sole legitimate purpose of the traffic stop. She never argued that Officer Weidl's acts of ordering Byrd out of the car and patting Byrd down were illegal and thus impermissibly extended the scope of the stop.

Simply put, because McClung did not argue that Officer Weidl's acts of ordering Byrd out of her car and patting down Byrd illegally extended the scope of the stop before the district court, she cannot now do so for the first time on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). McClung has abandoned her argument by failing to recognize that she is raising it for the first time on appeal contrary to Kansas Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35). See *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014) (holding that appellants who fail to comply with Rule 6.02[a][5] risk a ruling that their argument is improperly briefed and thus abandoned).

Turning to McClung's third argument, she asserts that the discovery of methamphetamine and paraphernalia in Byrd's boots did not "justify the search of the front of the car[,] including locked containers." According to McClung, "the mere fact that a backseat passenger in a car possessed paraphernalia does not provide probable cause to search the entire car for contraband." McClung does not challenge Officer Weidl's authority to search the area of the backseat where Byrd was sitting for drug-related evidence.

16

The district court correctly rejected McClung's contention that the officers lacked probable cause to search the entirety of her car. Byrd revealed that he possessed a marijuana pipe, which provided the officers with probable cause to search the backseat of McClung's car where Byrd had been sitting. The discovery of methamphetamine and drug paraphernalia in Byrd's boots provided probable cause to search the rest of the car. The evidence supports that when Officer Weidl discovered the methamphetamine and drug paraphernalia in Byrd's boots, the officers were also aware that: (1) McClung was currently under police investigation for distributing methamphetamine; (2) McClung was just at a known methamphetamine user's house; (3) McClung's driver's license was expired; (4) McClung refused to provide her driver's license upon officer request; (5) McClung advised her passengers to not provide their identification upon officer request; (6) McClung resisted being placed in handcuffs and the patrol car; and (7) Byrd—McClung's passenger—was in possession of marijuana, methamphetamine, and drug paraphernalia while riding in the car. The totality of the circumstances indicated that there was a very strong possibility that McClung's car contained additional evidence of drug-related crimes.

McClung contends there was insufficient probable cause to support the search of the remainder of the car. Under the facts of this case, the officers had probable cause to search the remainder of the car upon discovering the methamphetamine and drug paraphernalia in Byrd's boots.

McClung's final argument is that the State failed to establish that it had probable cause to seize her cell phone. She asserts that the district court had no choice but to suppress the seizure of her cell phone because the State presented no evidence at the suppression hearing to support the seizure of her cell phone. The State counters that the seizure of the cell phone was supported by probable cause because, under the totality of the circumstances, there was a fair probability that McClung's cell phone contained evidence of her facilitating the distribution of methamphetamine.

17

The State's position is more persuasive than McClung's. Although McClung moved to suppress all items seized by broadly arguing that the officers lacked probable cause to search the entirety of the car, she never made a specific argument about the seizure of her cell phone before the district court. She never specifically argued that the officers could not seize her cell phone because there was no fair probability that her cell phone would contain evidence of criminal activity. We need not consider McClung's argument about the seizure of her cell phone for the first time on appeal. See *Kelly*, 298 Kan. at 971 (holding that issues not raised before the district court cannot be raised for the first time on appeal).

Regardless of her failure to raise the seizure of her cell phone to the district court, McClung's argument fails on a factual basis. The totality of the circumstances indicated that she was engaging in methamphetamine distribution. Under such circumstances, the officers reasonably seized McClung's cell phone believing that there was a fair probability that it contained other evidence of methamphetamine distribution. Even assuming that McClung's argument about the seizure of her cell phone was properly before this court, we reject her argument as probable cause supported the seizure of her cell phone.

*Conclusion*

None of McClung's arguments addressing the denial of her motion to suppress are persuasive. The evidence supports that upon Byrd's admission to possessing a marijuana pipe, the officers obtained probable cause to search the backseat area of the car where Byrd had been sitting. The discovery of methamphetamine and drug paraphernalia in Byrd's boots provided the officers with probable cause to search the remainder of the car. The testimony supports that Byrd revealed to Officer Weidl that he possessed a marijuana pipe before Officer Riggs had dealt with McClung's uncooperative and obstructive

18

behavior during his investigation of the broken taillight and her expired driver's license. The officers obtained probable cause to search the entirety of the car without expanding the legitimate scope of the stop. We affirm the district court's denial of McClung's suppression motion.

II.    *The district court did not err by admitting the cell phone Cellebrite report into evidence.*

McClung contends that the district court erroneously admitted into evidence the Cellebrite cell phone report over her hearsay objection. Pointing to the text message exchanges within the report that the State relied on, McClung specifically argues that "[i]t is clear that those text messages were statements that were not made by a witness while testifying at trial, and were admitted for their truth." As a result, she asserts that K.S.A. 2020 Supp. 60-460's rule on the admission of hearsay prohibited the district court from admitting the Cellebrite report into evidence. She asserts we must reverse her three unlawful distribution of methamphetamine using a communication facility convictions.

The State counters McClung's argument in two ways. First, it contends that the arguments are inadequately briefed because McClung has not identified the specific text messages she is challenging as inadmissible and her record citations are inaccurate. Second, under the assumption that McClung's argument is adequately briefed, the State contends that McClung's hearsay objection is nonetheless meritless because it never offered the disputed text messages into evidence to prove the truth of the matter asserted within those text messages. Instead, the State contends that it offered the disputed text message exchanges into evidence to establish that McClung believed that she was in communication via cell phone with a potential methamphetamine buyer.

19

*Applicable Law*

McClung was convicted of three counts of unlawfully distributing methamphetamine using a communication facility, which is a severity level 8 nonperson felony contrary to K.S.A. 2020 Supp. 21-5707(a)(2). In relevant part, K.S.A. 2020 Supp. 21-5707(a)(2) provides that it is "unlawful for any person to knowingly or intentionally use any *communication facility* . . . in any attempt to commit . . . any felony under K.S.A. 2020 Supp. 21-5703, *21-5705* or 21-5706, and amendments thereto." (Emphasis added.) A "communication facility" as meant under K.S.A. 2020 Supp. 21-5705(a)(2) includes a cell phone. See K.S.A. 2020 Supp. 21-5707(c); *State v. Torres*, 53 Kan. App. 2d 258, 267, 386 P.3d 532 (2016) (describing a cell phone as a communication facility). Because distribution of methamphetamine is a severity level 2 felony pursuant to K.S.A. 2020 Supp. 21-5705(d)(3)(C), K.S.A. 2020 Supp. 21-5707(a)(2) criminalizes using a communication facility in the distribution of methamphetamine.

Under the plain language of K.S.A. 2020 Supp. 21-5707(a)(2), the State may charge a person with unlawfully distributing a controlled substance using a communication facility for "[e]ach separate use of a communication facility." As a result, in this case, the State could have theoretically charged McClung with every text message exchange on her cell phone in which it appeared that she sought to distribute methamphetamine.

We review a district court's denial of a hearsay objection for an abuse of discretion. *State v. Lemmie*, 311 Kan. 439, 449, 462 P.3d 161 (2020). An abuse of discretion occurs when the district court's decision is arbitrary, fanciful, or unreasonable, based on an error of law, or based on an error of fact. 311 Kan. at 449-50.

K.S.A. 2020 Supp. 60-460 controls the admission of hearsay statements into evidence, stating that absent the application of some exception, "[e]vidence of a

statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is [inadmissible] hearsay." K.S.A. 2020 Supp. 60-460(a)-(ee) lists exceptions to the general rule against excluding hearsay evidence. In addition to these listed exceptions, our Supreme Court has recognized three types of out-of-court statements that do not constitute hearsay under K.S.A. 2020 Supp. 60-460 because they are not offered to prove the truth of the matter asserted: "'(1) those statements material to the case as part of the issue; (2) those statements which are verbal parts of an act; and (3) those statements used circumstantially as giving rise to an indirect inference but not as an assertion to prove the matter asserted.'" *Boldridge v. State*, 289 Kan. 618, 634, 215 P.3d 585 (2009) (quoting *State v. Harris*, 259 Kan. 689, 699, 915 P.2d 758 [1996]).

There is little Kansas caselaw addressing what constitutes nonhearsay statements because they are material to the case as part of the issue. Although a handful of Kansas appellate courts have cited this rule, no Kansas appellate court has specifically applied the rule that statements material to the case as part of the issue do not constitute hearsay. See, e.g., *Boldridge*, 289 Kan. at 634; *State v. McKissack*, 283 Kan. 721, 737, 156 P.3d 1249 (2007); *Harris*, 259 Kan. at 699. There is only one Kansas case that discusses what constitutes nonhearsay statements because they are verbal parts of an act. In *State v. Oliphant*, 210 Kan. 451, 454, 502 P.2d 626 (1972), our Supreme Court noted that such a statement is "an extrajudicial statement [that] is offered merely to show the fact of its having been made," which may be admissible "when testified to by a person who heard it."

In *People v. Dominguez*, 454 P.3d 364 (Colo. App. 2019), the Colorado Court of Appeals considered whether text messages on a defendant's cell phone constituted statements that were verbal parts of the act. The court affirmed Dominguez' methamphetamine distribution conviction, rejecting his argument that the district court wrongly admitted the following text messages over his hearsay objection: (1) "'[c]an you

21

do 2 for 1500 if I got all of it'"; (2) "'[y]our voicemail is full'"; (3) "'[c]an you do that for me'"; (4) "'[c]all me please'"; and (5) "'[c]an you do 2 for 1600.'" 454 P.3d at 367. In doing so, the court explained that the district court properly denied Dominguez' hearsay objection because the disputed text messages constituted verbal parts of the act statements:

"[W]e conclude that the text messages were properly admitted verbal acts (as argued by the prosecution at trial), which are not hearsay. See *People v. Thompson*, 2017 COA 56, ¶ 135, 413 P.3d 306; *People v. Scearce*, 87 P.3d 228, 233 (Colo. App. 2003); see also *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009).

"'A verbal act is an utterance of an operative fact that gives rise to legal consequences.' *Scearce*, 87 P.3d at 233 (citation omitted). It's offered not for its truth, but to show that it was made. *Thompson*, ¶ 135. Thus, verbal acts aren't hearsay. . . . *Scearce*, 87 P.3d at 233; see also *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999) ('Performative utterances are not within the scope of the hearsay rule, because they do not make any truth claims.').

"The text messages sent to Dominguez's cell phone don't make any truth claims; rather, they suggest a request to purchase something at a proposed price. Such statements have a legal effect regardless of their truth. See *Scearce*, 87 P.3d at 233 (recognizing examples of a verbal act include oral utterances constituting the offer and acceptance for a contract); see also *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 218 n.20 (3d Cir. 2002) ('[A] statement offering to sell a product at a particular price is a "verbal act," not hearsay, because the statement itself has legal effect.'); *Little v. State*, 204 Md. 518, 105 A.2d 501, 503 (1954) (recognizing that the 'verbal act of taking a bet' was not inadmissible hearsay); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 801.11(3) (2d ed. 2018) (examples of a verbal act include contract offers and illegal solicitations).

"Even more to the point, 'the purchase of a drug, legally or illegally, is a form of contract.' *Garner v. State*, 414 Md. 372, 995 A.2d 694, 700 (2010) (citation omitted). And, '[t]he . . . words of [a] . . . would-be [drug] purchaser are . . . categorized . . . as

verbal parts of acts . . . [that] are not considered to be assertions and do not fall under the scrutiny of the Rules Against Hearsay.' . . .

"Like similar offers or solicitations, the text messages were not admitted here for the truth of the matter being asserted in them (whether Dominguez could do '2 for 1500' or '2 for 1600') or the truth of their arguably implied assertion (that Dominguez was someone who could provide '2 for 1500' or '2 for 1600'), *but for the fact that a request to purchase something at a proposed price was made*, which is not hearsay. Id. at 697, 704 (concluding that an unidentified caller's out-of-court statement asking, '[C]an I get a 40?' (a request to purchase cocaine) was admissible as a verbal act); see *Rodriguez-Lopez*, 565 F.3d at 315 (noting that evidence of 'ten successive solicitations for heroin' received by the defendant was not offered 'for [its] truth, but as evidence of the fact that [the solicitations] were made'); cf. *State v. Chavez*, 225 Ariz. 442, 239 P.3d 761, 762-63 (Ariz. Ct. App. 2010) (holding that text messages seeking to purchase drugs ('Can you deliver a "T" to the house?') were admissible because they were not offered to prove the truth of the matter asserted); *State v. Connally*, 899 P.2d 406, 408-10 (Haw. 1995) (concluding that statements that the defendant would perform sex acts for money were 'verbal acts' and not offered to prove the truth of the matter asserted)." (Emphasis added.) *Dominguez*, 454 P.3d at 369.

In *State v. Randle*, 311 Kan. 468, 477, 462 P.3d 624 (2020), our Supreme Court considered whether the rule that a statement used circumstantially as giving rise to an indirect inference constitutes hearsay. Randle argued that the district court wrongly admitted into evidence, over his hearsay objection, a coconspirator's out-of-court question to Randle's mother about the location of a gun. There, the district court allowed the question and answer into evidence over Randle's hearsay objection, concluding that the disputed question was not hearsay because it did not contain a factual assertion that could be true or false. In doing so, it also seemingly accepted the State's contention that it was offering the coconspirator's question into evidence to establish a connection between the coconspirator and the gun. On appeal, the Kansas Supreme Court rejected Randle's challenge to the admission of his coconspirator's question because the State had not offered the disputed question into evidence for the purpose of establishing the gun's

23

existence. Instead, "the State simply sought to establish the gun had some connection with [the coconspirator] because he was looking for it." 311 Kan. at 477. Said another way, the State offered the coconspirator's question into evidence for the purpose of providing circumstantial evidence allowing the fact-finder to make an indirect inference that the coconspirator was connected to the gun.

Here, it is undisputed that the State provided McClung with the Cellebrite report just weeks before her scheduled jury trial. Notwithstanding, McClung knew about the specific text messages the State intended to rely upon to support its unlawful distribution of methamphetamine using a communication facility charges because those text messages were included in the State's probable cause affidavit to support McClung's arrest. Although the State sought to admit only the four text message exchanges into evidence, McClung insisted that the entire Cellebrite report be admitted into evidence. This ultimately resulted in the district court admitting the physical disc containing the Cellebrite report—State's Exhibit 39—and the printout of the Cellebrite report—State's Exhibit 40—into evidence.

Despite requesting that the entire Cellebrite report be admitted into evidence, McClung objected to the admission of Exhibits 39 and 40 when the district court admitted both. In making her objection, McClung explained that although she preferred that the entire Cellebrite report be admitted into evidence, the particular text message exchanges that the State was relying on to support its four unlawful distribution of methamphetamine using a communication facility charges were inadmissible hearsay. However, McClung did not say why she believed that the disputed text message exchanges constituted inadmissible hearsay.

The State contends that the district court properly admitted the disputed text messages into evidence over McClung's hearsay objection. At trial, the State sought the admission of those text messages to circumstantially give rise to an indirect inference that

McClung believed she was in contact with a potential methamphetamine buyer. McClung responds that the State is parsing words. She contends that the State relied on the disputed text messages to prove that she used her cell phone to distribute methamphetamine. While the State contends that it sought the admission of the disputed text messages into evidence because they gave rise to an indirect inference that McClung believed she was in contact with a potential methamphetamine buyer, the disputed text messages are better categorized as verbal parts of the act statements. Here, a review of the four text message exchanges at issue supports that they are comparable to the text messages at issue in *Dominguez*, which the Colorado Court of Appeals found to be nonhearsay verbal parts of the act statements.

It is readily apparent that the State did not offer the exchange to prove the truth of the matter asserted in the texts. They were not offered to prove that sales of methamphetamine were completed or that McClung made any such sales. Instead, the State argues it offered the text messages simply to show that they were made. In making her argument, McClung ignores that to support her unlawful distribution of methamphetamine using a communication facility convictions, the State only needed to show that she used her cell phone in a knowing attempt to distribute methamphetamine. It did not have to prove that she actually completed the drug deal with whomever she was texting. See K.S.A. 2020 Supp. 21-5707(a)(2).

*Conclusion*

The State did not offer the four text messages at issue into evidence because it sought to prove the truth of the matter asserted pertaining to the apparent drug deals mentioned within those text messages. Because it merely needed to prove that McClung used her cell phone to enable the distribution of methamphetamine to support its unlawful distribution of methamphetamine using a communication facility charges against her, it necessarily follows that the State offered the text messages for the limited purpose of

proving that McClung used her cell phone to facilitate methamphetamine distribution—a purpose that is distinct from proving specific facts asserted or insinuated in each text message exchange. The four text messages in this case are comparable to the text messages that were at issue in *Dominguez*. As in *Dominguez*, the text messages here were not offered to prove the truth of the matter that they asserted about potential drug deals. To the contrary, they were offered "for the fact that a request to purchase something at a proposed price was made, which is not hearsay" because it constitutes a verbal parts of the act statement. 454 P.3d at 369. We affirm the district court's finding that the texts were not hearsay.

III.    *The prosecutor did not commit reversible error during closing arguments.*

In her final argument, McClung contends that the prosecutor committed reversible error during closing arguments by misstating facts and stating facts not in evidence on numerous occasions.

*Applicable Law*

When a defendant argues that a prosecutor committed error during closing arguments, this court applies the two-step prosecutorial error test. Under the first step of this test, we consider whether the complained-about conduct or statements fell outside the wide latitude afforded prosecutors to obtain the defendant's conviction in a constitutional manner. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If error is found under the first step, then we must complete the second step of the test, which requires us to consider whether the prosecutor's error was harmless under the constitutional harmless error test. The constitutional harmless error test requires the State to prove that there is no reasonable possibility that the prosecutor's error contributed to the jury's verdict. 305 Kan. at 109.

It is well-established that a prosecutor errs under the first step of the prosecutorial error test by misstating facts or stating facts not in evidence. See *State v. Conway*, 284 Kan. 37, 43-44, 159 P.3d 917 (2007). Our Supreme Court has explained that prosecutors do not commit error by using their closing arguments to explain to juries what they should look for when assessing witness credibility or by making closing arguments in which they draw reasonable inferences from the evidence. *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). When evaluating a prosecutor's closing argument for error, this court must consider the prosecutor's disputed statement in context rather than analyzing the prosecutor's disputed statement in isolation. 292 Kan. at 831.

*No Prosecutorial Error*

In her first prosecutorial error argument, McClung contends that the prosecutor committed error by making the following statement during her closing arguments:

> "As the evidence has shown, ladies and gentlemen, on December 21st, 2016, [McClung] was being surveilled by members of the Lawrence Police Department Drug Enforcement Unit. Throughout that day, those law enforcement officers saw [McClung] visit several known drug houses in her tan Toyota Avalon. And that evening, they saw [her] go again to another known drug house [on] Illinois Street."

McClung argues that no police officer testified that she had visited "several known drug houses" on December 21. The State responds that the prosecutor did not misstate facts or state facts that were not in evidence, noting that Detective Nicholson testified that she witnessed McClung go to two houses in addition to her house and Sutton's house on December 21. The State further notes that the detective testified that one of those houses, as well as Sutton's house, were known drug houses. According to the State, the evidence supported the prosecutor's statement that the officers witnessed her going to "several known drug houses" on December 21. McClung counters that even if she had visited two

27

drug houses that day, going to two drug houses in one day is not the same as going to several drug houses in one day.

The parties' disagreement about the meaning of the term "several" is irrelevant. In the end, the State's argument that any error stemming from this minor misstatement of fact was harmless beyond a reasonable doubt is persuasive. The prosecutor's comment about McClung visiting several known drug houses was a minor misstatement of fact. Because there was testimony indicating that McClung had visited at least two drug houses on December 21, it is highly unlikely that the prosecutor's statement that McClung had visited several known drug houses that day had any additional prejudicial effect on the jury's view of McClung's character.

Furthermore, there was other substantial evidence indicating that McClung was in possession of methamphetamine, in possession of drug paraphernalia, and unlawfully distributing methamphetamine using a communication facility. The evidence was overwhelming rendering any reference to "several" drug houses harmless.

McClung contends that the prosecutor committed error by making misstatements about who had access to her car. She asserts that the prosecutor erred when stating that McClung was the only person who drove her car on December 21.

McClung further asserts that the prosecutor erred by questioning Arnold's credibility when she testified that she did not need permission to get McClung's keys to access the car. McClung similarly argues that the questioning of Arnold's credibility constituted prosecutorial error because Arnold had testified that she told McClung that she had placed Byrd's bag containing the baggie of methamphetamine and the digital scale in the car immediately after the officers had completed their stop. The prosecutor stated:

"[I]s it credible to believe Pam Arnold's statements? That her friend of four or five years is charged with a crime and she . . . has information about that crime. She knows someone else committed it and she says nothing to anyone else for two years and four months? She apologizes to her friend about not asking for permission to place [the bag] into the glove box, but she doesn't know that it's there. Is that credible?"

The State responds by conceding that the prosecutor made "a minor misstatement of the evidence" by stating that McClung was the only person who drove her car that day. It notes that although there was evidence indicating she was the sole driver of her car the evening of December 21, there was no evidence indicating whether someone else had driven her car earlier that day. The State argues that any such misstatement that the prosecutor made regarding who had access to McClung's car throughout December 21 was harmless because overwhelming evidence supported McClung's convictions for distribution of methamphetamine, possession of drug paraphernalia, and unlawful distribution of methamphetamine using a communication facility.

As to the claim that the State erred by questioning Arnold's credibility, the State argues that McClung has taken the prosecutor's statement out of context. It asserts that the prosecutor was simply stressing that Arnold, for more than two years, did not tell law enforcement that Byrd was the owner of the baggie with over 10 grams of methamphetamine and the digital scale with methamphetamine residue.

The State's arguments are persuasive. As stressed in its brief, the State never argued that McClung had exclusive access to her car. At trial, Detective Nicholson testified that she saw several people go back and forth between Sutton's house and McClung's car, and they appeared to be moving different items from the house into the car. Arnold's testimony confirmed that many people helped Sutton move items from his house to McClung's car the evening of December 21. Accordingly, regardless of the prosecutor's insinuations that there was limited access to McClung's car, the jury undoubtedly knew that other people had opportunities to access the car without McClung

29

knowing. There is no reasonable probability that the prosecutor's brief suggestion that McClung was the only person who drove her car that day had any bearing on the jury's verdict. Similarly, there is no reasonable probability that the prosecutor's brief questioning of Arnold's credibility based on her errant belief that Arnold had to ask McClung's permission for her car keys before putting Byrd's bag into the glovebox had any bearing on the jury's verdict.

The prosecutor's questioning of the veracity of Arnold's testimony based on Arnold's failure to tell anyone, for more than two years, that the items seized from McClung's glovebox belonged to Byrd was not erroneous. It is not disputed that Arnold testified that after the police completed their stop, she told McClung that she had put the bag containing the baggie of methamphetamine and the digital scale in the glovebox at Byrd's direction, thinking that Byrd's bag contained tools. It is undisputed that there is nothing in the record to show that, for more than two years, Arnold failed to tell law enforcement that the items seized from McClung's glovebox belonged to Byrd. The prosecutor was trying to highlight this fact when she questioned the veracity of Arnold's testimony. In context, the prosecutor's statement was not erroneous.

McClung challenges the prosecutor's statement that "[t]here's no jewelry found in the car" during the police search. The prosecutor made this statement when questioning the claim that McClung had numerous baggies in her purse because she was selling jewelry online. McClung contends that the prosecutor made a misstatement of fact because none of the police officers testified about whether they discovered jewelry during the search of her car. Nonetheless, the prosecutor's statement was a reasonable inference from Officer Weidl's testimony that outside of the items in Byrd's boot, the items in McClung's glovebox, and the baggies in McClung's purse, he found nothing "else of evidentiary value" in McClung's car.

McClung asserts that during the State's rebuttal, the prosecutor argued a fact not in the evidence by suggesting there was more than one cell phone at her house. This statement was based on the testimony of Detective Nicholson, who stated he called Jessie to pick her mother up after the police completed their stop. McClung contends that this was an erroneous inference from the evidence because Detective Nicholson actually testified that she was unsure whether she called Jessie or McClung's other daughter, Carly. Jessie had testified that everybody who lived in her mother's house, including herself, all depended upon her mother's cell phone. Arnold's testimony that the police called Jessie gave rise to an inference that Jessie had a cell phone available to her in addition to her mother's cell phone, which the police had in their custody.

During her testimony, Jessie explicitly testified (1) that her sister Carly lived in her mother's house in December 2016; (2) that her mother's cell phone was the only cell phone functioning in her mother's household in December 2016; and (3) that everyone in her mother's household, including Carly, was relying on her mother's cell phone in December 2016. The simple fact that Detective Nicholson was able to call one of McClung's daughters the evening of December 21 supported the prosecutor's inference that McClung's entire household was not sharing the same cell phone. Regardless of whether Detective Nicholson spoke to Jessie or Carly, the fact she spoke to one of the sisters supported the prosecutor's inference that people inside McClung's household had more than just her cell phone available to them.

McClung originally took issue with the prosecutor's comment that the baggie of methamphetamine taken from Byrd's boots and the baggies taken from her purse both had a Walgreens logo on them. In her reply brief, McClung concedes that both the baggies from her purse and the baggie found in Byrd's boot had the Walgreens logo on them. However, she does argue that the fact that the baggie had the logo on it does not prove or provide a reasonable inference that she sold drugs to Byrd since they live in the same house and Byrd may have taken a baggie from the house. Given all the other evidence

31

supporting McClung's involvement in methamphetamine distribution, the prosecutor's inference that she sold Byrd the baggie of methamphetamine was reasonable.

*Conclusion*

To conclude, although McClung argues that the prosecutor committed seven instances of reversible error by misstating facts and stating facts not in evidence during closing arguments, her arguments are unconvincing. Additionally, in the one instance that McClung has established the prosecutor committed a misstatement of fact, the State has established that error, along with McClung's other claims of prosecutorial misconduct, were harmless beyond a reasonable doubt. We affirm McClung's convictions for distributing methamphetamine, possessing drug paraphernalia, and unlawfully distributing methamphetamine using a communication facility.

Affirmed.